[No. A039164. First Dist., Div. Two. June 22, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
SANTIAGO VALDEZ MORENO, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

* Pursuant to rules 976 and 976.1, California Rules of Court, the published part follows.

---

## COUNSEL

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Stan M. Helfman and Rene A. Chacon, Deputy Attorneys General, for Plaintiff and Respondent.

---

## OPINION

**KLINE, P. J.**—Appellant Santiago Valdez Moreno appeals following his conviction on 12 counts of committing lewd and lascivious acts upon children under the age of 14 years (Pen. Code, § 288, subd. (a))[1] and two counts of sodomy (§ 286, subd. (c)). He contends (1) the prosecution presented unspecific evidence insufficient to sustain conviction on 10 of the counts; (2) the convictions on counts 12 through 16 must be reversed because the jury might have convicted him based on the lewd and lascivious act underlying count 11; (3) the court erred in failing to instruct on the offense of annoying or molesting a child (§ 647a) as a possible lesser included offense on the counts charging violations of section 288, subdivision (a); (4) the prosecutor committed misconduct by appealing to the passion and prejudice of the jury; and (5) the court improperly imposed the upper term based on the youth of the victims, an inherent element of the offenses involved. We affirm.

### STATEMENT OF THE CASE

An information filed on November 6, 1986, charged appellant with twenty-one counts of lewd or lascivious conduct with a child under age fourteen (§ 288, subd. (a)), three counts of sodomy (§ 286, subd. (c)), two counts of oral copulation (§ 288a, subd. (c)), and one count of penetration by a foreign object (§ 289, subd. (a)). With respect to 25 of the 27 counts it was also alleged that appellant occupied a position of special trust within the meaning of section 1203.066, subdivision (a)(9). On December 10, 1986, appel-

---

[1] All subsequent statutory references are to the Penal Code, unless otherwise indicated.

lant's demurrer to the information was denied and he pleaded not guilty to all counts and denied the allegations.

On February 20, 1987, the prosecutor filed a first amended information charging fifteen counts of lewd or lascivious conduct with a child under age fourteen (§ 288, subd. (a)), three counts of sodomy (§ 286, subd. (c)), two counts of oral copulation (§ 288a, subd. (c)), and two counts of penetration by a foreign object (§ 289, subd. (a)). It was also alleged in all 22 counts that appellant occupied a position of special trust within the meaning of section 1203.066, subdivision (a)(9). That same day, appellant pleaded not guilty to all counts and denied the allegations.

On March 13, 1987, appellant's motion to dismiss the information (§ 995) was denied.

On April 27, 1987, appellant's trial by jury commenced. That same day, the court again amended the information to name a proper victim in counts 5 and 12 on the prosecutor's motion. At the close of the People's case on May 11, 1987, the court dismissed counts 18 and 21 pursuant to appellant's acquittal motion (§ 1118.1). Counts 5, 12 and 17 of the information were amended to charge lewd or lascivious conduct with a child under age 14 (§ 288, subd. (a)). The enhancements attached to counts 5, 12, 14, 16, 17, 18 and 22 were stricken.

On May 14, 1987, the jury returned verdicts acquitting appellant of counts 2, 3, 6, 9, 10 and 20. The jury found appellant guilty of counts 1, 4, 5, 7, 8, 11, 12, 13, 14, 15, 16, 17, 19 and 22, and found true the enhancements collateral to those counts.

On July 1, 1987, the trial court denied probation, sentenced appellant to state prison for a total term of 20 years, and awarded him 460 days of presentence custody credit. The court chose count 4 (sodomy) as the base term and imposed the upper term of eight years. The court imposed the upper term of eight years on count 11 (sodomy) to run consecutively to the other counts and stayed all but two years pursuant to section 654. The court also imposed the upper term of eight years on counts 1, 7, 13, 17 and 19 (lewd conduct), with the sentence on each count to run consecutively to the other counts and stayed all but two years on each count pursuant to section 654. Finally, the court imposed the upper term of eight years on counts 5, 8, 12, 14, 15, 16 and 22 (lewd conduct), each count to be concurrent to the other terms imposed.

This timely appeal followed.

### STATEMENT OF FACTS

The wife married appellant on December 14, 1975, and bore three daughters from the marriage. The eldest daughter, was born November 29, 1977,

the middle daughter was born March 21, 1979, and the youngest daughter was born August 12, 1981. Due to appellant's alcohol abuse the wife and appellant separated in 1981, several months before the youngest daughter was born. In 1982, the wife moved with her daughters to Lutztown Court in Santa Rosa where they had a roommate named Chapena. Later in 1982, after appellant sobered up and became an Alcoholics Anonymous counselor, he reconciled with the wife and moved into her apartment.

During the fall of 1985 appellant's mother died and appellant again began to abuse alcohol. During the latter part of 1985 and into 1986, the wife worked as a janitor from 6 p.m. until 3 a.m.; appellant stayed at home with the girls while the wife worked.

The wife testified that during her fights with appellant during the latter part of 1985 and early 1986 he became violent and slapped and choked her. Finally, on April 30, 1986, she returned home at 10 p.m. to find appellant drunk and angry because he could not find a spatula in the kitchen. Appellant screamed at the wife and the girls, grabbed her arm, pulled her hair, then choked her. The girls attempted to come to her aid. The wife and the girls finally escaped and went to the battered women's shelter that night.

They stayed at the shelter until the latter part of June 1986. While at the shelter, the eldest daughter first told the wife that appellant had touched her privates. Middle and youngest daughters also reported to wife that appellant had touched their privates.

In February 1985, Child Protective Services had investigated appellant for child abuse after the eldest daughter told someone at school that appellant slept with her. When first contacted by child protective services in 1985, the wife believed the agency's concern that appellant was sleeping with the eldest daughter was silly and the wife never questioned her about the matter. The wife testified that the eldest daughter had lied to her before. The wife never noticed blood on any bedsheets or on the girls' underwear.

The nine-year-old, eldest daughter testified that it was at the shelter that she first told wife appellant had put his private into her private. The eldest daughter indicated that appellant violated her when he drank alcohol. The eldest daughter explained that appellant began to violate her when she was in kindergarten. According to the eldest daughter, when wife and Chapena were not at home, appellant would take the eldest daughter into his bedroom and violate her. At times, appellant molested the eldest daughter while the youngest daughter and middle daughter were also present in his bedroom watching television. The eldest daughter testified that she witnessed appellant masturbating; if semen got on his hand, appellant would ask one of the girls to fetch him toilet paper or a sock to wipe himself off. This was consistent with the wife's testimony that appellant sometimes used

a sock to clean himself after their lovemaking. The eldest daughter asserted that appellant threatened to beat her or her mother if she told anyone he had molested her.

At her sisters' urging, the eldest daughter once tried to tell her mother about the molestations, but she was too busy to listen. The eldest daughter finally told a woman at the shelter and then repeated the account to her mother. The eldest daughter stated she did not tell her counselor because she was afraid.

The eldest daughter testified that appellant placed his penis in her vagina on 10 to 15 different occasions. Appellant would tell the eldest daughter what position to take before violating her; the eldest daughter used a doll to demonstrate the positions she assumed for her father.

On November 29, 1985, the eldest daughter's birthday, appellant took the children out for dinner. The eldest daughter testified that it was not a happy birthday for her. Although she could not recall this incident at trial, she remembered testifying at the preliminary hearing that appellant had placed his penis in her private on her birthday.

On Christmas day in 1985 the eldest daughter received a backpack and shoes for gifts. When the eldest daughter's mother left for work Christmas night, appellant put his penis into the eldest daughter's vagina. That night, she observed appellant also putting his penis into the youngest daughter's and the middle daughter's privates.

The eldest daughter testified that appellant put his penis into her anus on only one occasion. She did not remember exactly when this occurred but she did remember that it happened after her grandmother died in 1985 and that appellant was drunk. She remembered testifying at the preliminary hearing that appellant put his penis into her anus after she began second grade in 1985, and before her birthday in November of that year.

The eldest daughter testified that while she was in kindergarten, appellant put his penis in her vagina more than once. On the first occasion, she remembered that the middle daughter and the youngest daughter were not present in appellant's bedroom. While in the first grade during the fall of 1983, appellant put his penis in the eldest daughter's vagina more than once. While repeating the first grade in the fall of 1984, appellant put his penis in her vagina more than twice. While in second grade during the fall of 1985 and after her grandmother's death, appellant put his penis into the eldest daughter and her sisters more often.

The eldest daughter observed appellant violate the middle daughter in the same manner as he did the eldest daughter. On two or three occasions, the

eldest daughter observed appellant face the middle daughter's backside as she was on her hands and knees with her rump in the air. Appellant's penis was close to her rump. At times the youngest daughter was present when appellant violated the other two girls and would get a sock or toilet paper for appellant just like her sisters did when she was violated by appellant.

At times, appellant violated the eldest daughter by placing two fingers on her vagina. She recalled that appellant did this to her around Easter of 1986.

The middle daughter testified that she loved her father and believed he was handsome and nice when he was sober. The middle daughter, who was in the second grade at the time of trial, reported that she went to the shelter with her mother and sisters following a fight between the wife and appellant. At the shelter, the middle daughter told her mother that appellant touched her vagina and anus. The middle daughter testified that appellant violated her most often when he was drinking. According to the middle daughter, appellant touched her vagina with his hands or penis; she testified that it hurt when appellant penetrated her vagina, but she did not tell her father it hurt because she was afraid to anger him.

When the middle daughter was violated, her sisters were usually present watching television in appellant's bedroom. The middle daughter would also be present when the eldest daughter was violated by appellant. Using a doll, the middle daughter showed the jury how she lay on her back when she was violated by appellant. The middle daughter testified that she heard the eldest daughter tell appellant not to molest her but that appellant would order her to submit.

During the time the middle daughter was in preschool, appellant put his penis into her mouth. She also testified that she observed appellant move his hand up and down on his penis and saw "white stuff" come out of his penis. Appellant would wipe off the white stuff from his hand with toilet paper or a sock the girls brought to him.

The middle daughter testified that during the year she was in preschool (in 1983) appellant put his penis in her vagina more than once. While in kindergarten, appellant also put his penis in the middle daughter's vagina more than once. While in first grade, appellant put his penis in her vagina more than 10 times. She testified that appellant put his penis into her anus "a lot." Chapena and the wife were never at home when appellant did these things to her.

The middle daughter stated she feared appellant would kill her mother when appellant and the wife argued. The middle daughter did not want to get her father into trouble because she loved him and wanted her family to

stay together. She testified that she sometimes had nightmares about appellant violating her.

The five-year-old, youngest daughter testified that she loved her father. She remembered reporting that her father touched her privates with his privates. Sometimes appellant would touch her privates with her sisters being present. Appellant touched her vagina or anus with his hand or penis. She testified that appellant first touched her private when she was four years old and that he had touched her privates more than four times. She saw appellant touch the middle daughter the same way he touched her; she asserted that the eldest daughter screamed when appellant would try to touch her. The youngest daughter also indicated that, like her sisters, she would get a sock or toilet paper for her father to clean himself. Appellant warned her he would spank her if she told anyone about the touching.

Community Hospital family nurse practitioner Rachel Hardester testified concerning the sexual assault examinations she conducted on the three girls. She testified that the eldest daughter had no observable hymenal tissue and that her vaginal opening gaped open to easily expose her vaginal walls with no manipulation. The nurse observed that her vaginal opening was 20 to 30 millimeters wide, two to three times the maximum size expected of a girl in her age group who was not sexually active.

Nurse Hardester further explained that the tissue near the entrance to the eldest daughter's vagina was reddened and thickened. She testified that the thickening was indicative of scar tissue developed in response to chronic irritation; the redness is a common finding with recent sexual intercourse. At the eldest daughter's anterior vaginal wall, bright red blood vessels (or petechiae) were observed and a superficial fissure or tear at her perianal area was also noted. Nurse Hardester opined that the conditions she observed were consistent with chronic recurrent penetration by an adult penis.

Nurse Hardester testified that the middle daughter also had no discernible hymenal tissue and that her vaginal opening, although not as dramatically enlarged as the eldest daughter's, was abnormally wide. Broken blood vessels and redness were observed on the middle daughter's vaginal walls. In nurse Hardester's opinion, the middle daughter's symptoms also were consistent with chronic penetration by an adult penis.

Nurse Hardester testified that the youngest daughter also had no discernible hymenal tissue. The youngest daughter's vaginal opening was larger than expected for her age and redness and thickening were noted near her anus. The findings with respect to the youngest daughter were consistent with penetration by a penis.

Associate medical director of Community Hospital, Dr. John Dervin, testified concerning the sexual assault examinations he helped administer to

the three girls and corroborated nurse Hardester's testimony. Dr. Dervin noted the eldest daughter's lax vaginal musculature and estimated her vaginal opening to be 40 to 50 millimeters wide. In Dr. Dervin's opinion, the degree of musculature relaxation found in her case was more characteristic of an adult woman who had borne children than that of an eight year old. The doctor also testified that broken blood vessels found on the anterior vaginal wall of a seven year old (the middle daughter's age at the time of the exam) are characteristic of trauma. The doctor further stated that the reddening and thickening of the superior aspect of the youngest daughter's anus are characteristics of external anal trauma.

*Defense*

Dr. Michael Davis was the regular pediatrician for the girls. Dr. Davis examined the eldest daughter on November 21, 1984, the middle daughter on May 17, 1983 and the youngest daughter during May of 1984. Dr. Davis testified that he found no abnormal conditions on the girls' genitalia, although he admitted not being trained to conduct a sexual assault exam. He further stated that he merely looked at each girl's genitalia briefly during the exams. Dr. Davis testified that a 20- to 30-millimeter vaginal opening would be an abnormal finding for a child.

Bruce Barton, the eldest daughter's counselor, testified that she did not report being sexually molested by appellant. Mr. Barton never asked her whether she had been molested.

Child protective services social worker Doris Sami testified that she interviewed the eldest daughter on February 13, 1985, about possible sexual abuse. At that time, the eldest daughter reported that when her parents argued, her father would sometimes sneak into bed with her and hold her close. She denied that appellant touched her privates. Later, Ms. Sami contacted appellant who denied any inappropriate touching. Ms. Sami testified that the interview with the eldest daughter was conducted in a semi-private office at her school and she seemed guarded. When they discussed sexual touching, she became agitated, fidgeted, and spoke quickly.

Investigating Detective Jack Karr testified that the eldest daughter told him she had kicked appellant and had written him notes saying she hated him. She said that appellant hit her in the legs and caused bruises. She also told Detective Karr that she told a friend, Gary P., about every instance of molestation as well as telling her teachers and a police officer.

Psychiatrist Lee Coleman testified that the diagnosis of sexual abuse is highly subjective and emotionally charged. Dr. Coleman last conducted physical examinations in 1971 and had never conducted a sexual assault examination. He testified that, because of their desire to protect children,

examiners are often not objective. Dr. Coleman reviewed the results of the sexual exams administered to the three girls in this case; in his opinion, the results were not helpful since there was evidence of bias and there were no photographs taken of the subjects. The absence of hymenal tissues and the size of vaginal openings found were, in his view, not dispositive because of the dearth of research correlating such phenomena to sexual abuse. The findings of petechiae and reddened or thickened tissue are subject to dispute because normalcy with respect to each girl was never established. The finding of perianal fissure was a very nonspecific finding and quite common. In sum, the medical findings were not reliable indicators of molestation in Dr. Coleman's estimation.

Appellant testified in his own behalf and denied molesting his daughters. An alcoholic since the age of 20, appellant asserted he was sober for the two and one-half year period prior to his mother's death on October 30, 1985. Appellant testified that privacy was limited in their apartment and that his daughters would often interrupt his bathing and use of the toilet. The children slept with the wife and appellant often. Appellant admitted his drinking caused a lot of his marital difficulties.

Appellant testified that it was not unusual for the children to see their parents being passionate with each other. On occasion, the children would walk in on their parents' lovemaking. On more than a dozen occasions, the girls also walked in on appellant masturbating. On those occasions, appellant would ask the children to get him socks or underwear to clean himself.

Appellant testified that the eldest daughter was able to draw his penis because she had seen him holding his penis while urinating. Appellant admitted he shared a bed with his daughters on many occasions during the periods in question.

*Rebuttal*

The wife testified that the children never walked in their room while she and appellant were making love.

Registered nurse Gail Jackson, Sonoma County coordinator for the medical legal examination team, testified that she had examined the genitalia of numerous children not suspected of being sexually abused. Ms. Jackson has also examined about 300 children suspected of being sexually abused and her findings have been reviewed by physicians. In her experience, there has not been a divergence of opinion respecting medical indications of child sexual abuse. According to nurse Jackson, absence of hymenal tissue in a child means that some form of penetration took place and broken blood vessels on vaginal walls can be caused by trauma to those vaginal walls.

Generally, superficial fissures in the perianal areas are caused by some type of penetration injury.

## DISCUSSION

### A. *Specificity and Sufficiency of the Evidence*

#### 1. *Counts 7, 8, 13, 14, 15, 16, 17, 19, and 22*

 Appellant complains that his convictions on nine of the counts charging lewd and lascivious acts cannot stand because the prosecution failed to prove any specific violations of the law, which denied appellant due process rights. In light of the prosecution's asserted failure to adequately prove its case on these counts, appellant claims the trial court should have granted his motion for acquittal under section 1118.1.

 Appellant's argument rests very heavily on *People* v. *Van Hoek* (1988) 200 Cal.App.3d 811 [246 Cal.Rptr. 352] and *People* v. *Atkins* (1988) 203 Cal.App.3d 15 [249 Cal.Rptr. 863], which typify what have recently come to be known as "resident child molester" cases, "a term coined to apply to a person who either resides in the same home with the minor or who has unchecked access to the child and repeatedly sexually molests the child over a long period of time." (*People* v. *Jones* (1989) 209 Cal.App.3d 89, 95 [257 Cal.Rptr. 342] review granted, June 29, 1989 (S010191).) In both of these cases convictions of child molestation were reversed due to the prosecution's failure to provide evidence of specific acts. In *Van Hoek* the defendant was convicted of eight counts of illicit sexual conduct with his daughter. Because the victim could not link the incidents to any specific time, such as a holiday or a birthday, the court reversed the convictions, describing her testimony as "a blur of acts, nonspecific as to a particular occasion." (200 Cal.App.3d at p. 817.) Similarly, in *Atkins,* the defendant was convicted of molesting his stepdaughter. The court reversed his conviction on two of five counts, finding the nonspecific testimony insufficient to support those counts. (203 Cal.App.3d at p. 19.)

Preliminarily, appellant is not asserting a violation of the "either/or rule," the principle that "when the accusatory pleading charges a single criminal act and the evidence shows more than one such unlawful act, *either* the prosecution must select the specific act relied upon to prove the charge *or* the jury must be instructed in the words of CALJIC No. 17.01 or 4.71.5 or their equivalent that it must unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act. (See *People* v. *Dunnahoo* [1984] 152 Cal.App.3d [561] at 568-570 [199 Cal.Rptr. 796], and cases cited therein including *People* v. *Deidrich* [1982] 31 Cal.3d [263] at pp. 280-281 [182 Cal.Rptr. 354, 643 P.2d 971].)" (*People* v. *Gordon*

(1985) 165 Cal.App.3d 839, 853 [212 Cal.Rptr. 174], fns. omitted.) Here the court gave CALJIC No. 4.71.5 with respect to each count.[2]

■ To the extent appellant casts his argument in constitutional terms—claiming a deprivation of his right to due process—he appears to be employing two separate theories. The first is that the lack of specificity in the charges and the evidence upon which they were based rendered him unable to prepare and present a defense. (*In re Hess* (1955) 45 Cal.2d 171, 175 [288 P.2d 5]; *People v. Jones* (1984) 155 Cal.App.3d 153, 179 [202 Cal.Rptr. 162].) ■ The second is that this lack of specificity made it impossible for the jury to agree on any of the specific acts of which he was convicted.

■ The vagueness appellant complains of in connection with the first prong of his constitutional argument is the failure of the charges and the evidence to identify the specific times at which the alleged criminal acts took place. *People v. Van Hoek, supra,* 200 Cal.App.3d 811, provides support for this contention. As stated in that opinion "[a] serious problem with the vague charges and the testimony upon which they are based is that the defendant's ability to defend is severely hampered. A 'resident child molester' would virtually be precluded from presenting an alibi defense to the acts unless he could account for every time he was in the presence of the victim . . . . [D]efendant, because he was the victim's father and lived in the household, has no idea what specific time or specific act he has to defend against. The defendant would virtually have to account for every day of the last five years during which he had contact with C. to enable him to present any kind of alibi defense." (*Van Hoek, supra,* 200 Cal.App.3d at p. 817.)

Like other courts, we believe the foregoing analysis greatly exaggerates the likelihood of an authentic alibi defense in "resident child molester" cases. As pointed out in *People v. Obremski* (1989) 207 Cal.App.3d 1346 [255 Cal.Rptr. 715], *Van Hoek* and its progeny place "a misguided emphasis on the right of resident child molesters to rely on alibi as a defense." (*Id.,* at pp. 1352-1353.) "*Van Hoek* is incorrect because it attempts to fit the crime to the defense instead of fitting the defense to the crime. In cases where the child molester lived with the victim for an extensive, uninterrupted period and therefore had continual day and night access to the vulnerable child, neither alibi or wrongful identification is likely to be a reasonable defense. (*People v. Dunnahoo* [(1984) 152 Cal.App.3d 561, 572].) If the

---

[2] The instruction as given provides, in relevant part, as follows: "In order to find the defendant guilty it is necessary for the prosecution to prove beyond a reasonable doubt the commission of a specific act constituting said crime within the period alleged.

"In order to find the defendant guilty, you must unanimously agree upon the commission of the same specific act constituting said crime within the period alleged.

"It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

victim of a resident molester is able to testify only to a general sexual interaction with the molester, the molester himself is likely to be similarly handicapped in eliciting from his memory specific details concerning the date, time and place of his activities during the years of his residence with the victim. Forcing the prosecution to an election in this factual situation achieves the anomalous result of subjecting to prosecution only those defendants who select victims with better memories or who are one act offenders." (*Id.,* at p. 1353; *People* v. *Coulter* (1989) 209 Cal.App.3d 506 [257 Cal.Rptr. 391].)

In the present case, as in *Obremski,* appellant did not at trial assert that he might be able to offer an alibi defense if the charges were clarified. Nor did appellant present an alibi with regard to offenses claimed to have occurred on specific dates, such as the alleged molestations of the eldest daughter on her birthday and on Christmas of 1985. Appellant's failure to present an alibi seems much less due to any uncertainty in the charges than to the repetitive nature of the charged acts and his daily access to the children.

Moreover, the vagueness of some of the evidence relied upon by the prosecution did not otherwise impair appellant's ability to defend himself. In our opinion, appellant's defense would have been substantially the same even if the children had been able to more specifically describe individual molestations, because appellant's ability to refute the girls' testimony would have been hampered, as was the girls' testimony, by both the passage of time and the fundamental similarity of the numerous acts testified to. For example, it is highly unlikely appellant would have recalled enough to effectively discredit the middle daughter's testimony if she had specified what she was wearing at the time of a particular molestation, or what day of the week it was.

Instead, appellant presented exactly the type of defense one might expect. He sought to undermine the victims' credibility by offering examples of past fabrications and produced expert testimony questioning the value of the physical evidence relied upon by the prosecution. He also presented the girls' own pediatrician, Dr. Davis, who testified that his examination of the children revealed no abnormalities. Finally, in his own testimony, appellant not only denied the charges but provided an innocent explanation for his daughters' familiarity with his body and with sexual matters generally. The jury's verdict shows that this evidence was simply insufficient to raise a reasonable doubt as to appellant's guilt in the face of the children's testimony and the corroborating evidence.

█ Appellant's alternative constitutional theory, which is more formidable, is based on a line of cases beginning with two 1901 rape cases, *People*

v. *Castro* (1901) 133 Cal. 11 [65 P. 13] and *People* v. *Williams* (1901) 133 Cal. 165 [65 P. 323]. Relying upon these cases, the Fifth District in *Van Hoek* and again in *People* v. *Atkins, supra,* 203 Cal.App.3d 15, observed that "[i]mplicit in the cases requiring specificity of charges and the charges being supported by specific testimony given at trial is the fundamental due process rule, steeped in antiquity, that the prosecution must prove a specific act and the twelve jurors must agree on one specific act." (*Van Hoek, supra,* 200 Cal.App.3d at p. 817; *Atkins, supra,* 203 Cal.App.3d at p. 22.)

Appellant concedes that "[i]n the ordinary situation, where testimony shows more than one specific act which may support a conviction on a criminal count alleged, a jury instruction such as CALJIC 4.71.5 will provide adequate protection." His point is that where, as is assertedly the case here, "there are *no* specific acts shown by the testimony, yet there are several vaguely described acts testified to, a jury instruction such as CALJIC 4.71.5 is of no use." (Italics in original.) The crux of the problem, as appellant sees it, is that the charges and the testimony upon which they were based made it impossible for the jury to unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act.[3]

Before turning to an examination of the evidence it is appropriate to note a general objection to appellant's theory that because the jury could not distinguish one act from another it could not possibly agree that he committed any particular act. "To infer the inability to single out a particular act necessarily implies a jury could not conclude the defendant committed that act overlooks the very real possibility that the jury believed everything the victim said and thus agreed defendant committed all of the acts to which the victim testified. If the jury agreed defendant did all of the acts testified

---

[3] The penal statutes appellant was found to have violated describe criminal offenses consisting of an "act." For example, Penal Code section 288a, subdivision (a) defines "oral copulation" as "the act of copulating the mouth of one person with the sexual organ or anus of another person." Subdivision (b) of the statute provides that, except as provided in section 288, "any person who participates in an act of oral copulation with another person who is under 18 years of age shall be punished by imprisonment in the state prison, or in a county jail for a period of not more than one year." (See also Pen. Code, §§ 286 and 288.) Penal statutes such as this are thus different from those which may be violated by a continuous course of conduct or by a series of acts over a period of time. Penal Code section 273a is a statute of the latter variety; it provides that "Any person who . . . willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health may be endangered," is guilty of a crime. Because the offenses typically committed by "resident child molesters" represent repetitive or continuous conduct in many ways analogous to offenses such as that described in Penal Code section 273a, the Legislature did not need to define them as necessarily constituting a single "act." If such offenses were otherwise described in the Penal Code, the problems of pleading and proof with which we are here concerned might be eliminated.

to, it necessarily agreed he committed the single act or acts charged." (*People* v. *Vargas* (1988) 206 Cal.App.3d 831, 853 [253 Cal.Rptr. 894].)[4] This is particularly true in the instant case where, in our view, the evidence of guilt was equally strong as to all the counts of which appellant was convicted. Thus, if the jury believed the children's claim that they were molested they likely believed their testimony in its entirety: for example, if the jury considered the middle daughter's testimony credible, as apparently it did, there would be no reason for it to conclude appellant had molested her only once, while she was in kindergarten, when she asserted it happened more than one time.

The finding that appellant was not guilty of six of the charges did not require the jury to disbelieve the children's testimony. For example, the jury found appellant not guilty of the lewd acts alleged in counts 2 and 3 to have occurred in November and December 1985 presumably because the eldest daughter could not remember either of the charged acts. The jury apparently found appellant not guilty of count 6, alleging an act of oral copulation with the eldest daughter during the period September 1983 to April 1986, because the eldest daughter testified that she refused to comply with appellant's attempt to force her to orally copulate him.

Examining the evidence as a whole, we are satisfied that the jury could, as we assume it did, agree on the specific acts of which it found appellant guilty. We discuss the evidence separately as it relates to each of the three victims.

*The Eldest Daughter*

Appellant was found guilty of five counts based on offenses committed against the eldest daughter. He challenges the sufficiency of the evidence supporting counts 7 and 8 pursuant to which he was convicted of committing lewd conduct upon the eldest daughter between September 1984 and September 1985. These convictions were supported by the eldest daughter's testimony that (1) while she was in first grade (Sept. 1984 to Sept. 1985) appellant placed his penis in her vagina more than twice; (2) the molestations occurred in her parents' bedroom; and (3) she was molested while

---

[4] While we agree with *Vargas*'s analysis of the unanimity issue, we reject its anomalous conclusion that although the jury could have believed all of the victim's testimony (and therefore agreed that the defendant committed each particular act charged), the use of this nonspecific testimony violated the defendant's due process rights because "[a]bsent evidence that would permit a distinction between the numerous acts testified to, it would be impossible for the jury to isolate a particular act and unanimously agree the defendant committed that particular act." (206 Cal.App.3d at p. 854.) We find this conclusion perplexing since on the previous page the court had argued that "[i]f the jury agreed defendant did all of the acts testified to, it necessarily agreed he committed the single act or acts charged." (*Id.,* at p. 853.)

appellant was alone with his three daughters. It was undisputed that appellant was often alone with the girls in the evenings while the wife was at work. The eldest daughter also used a doll to demonstrate for the jury how she would lie with her legs spread and her hands behind her back when appellant molested her and how she would move according to his orders. Finally, nurse Hardester's testimony, confirmed by Dr. Dervin, provided compelling medical evidence that the eldest daughter had been repeatedly violated. According to the eldest daughter, appellant warned her not to tell anyone of the things he did and threatened to beat her if she revealed his actions. The eldest daughter's youngest sister testified that she witnessed her screaming to avoid the molestations by appellant.

*The Middle Daughter*

Appellant was convicted of two counts of lewd conduct upon the middle daughter between September 1985 and April 30, 1986, while she was in first grade and two counts of lewd conduct upon the middle daughter while she was in kindergarten (Sept. 1984 to Sept. 1985). In support of these convictions she asserted that during the first grade appellant put his penis in her vagina more than once and during the year in kindergarten he molested her more than once. She also told the jury that appellant only molested her when the wife and Chapena were out of the house and that the molestations occurred in appellant's bed. The middle daughter indicated that she usually lay on her side when appellant violated her and that her sisters were usually in the room when these incidents occurred. She testified that it hurt when her father did these things to her, but she was too frightened to tell him. She described how she witnessed appellant masturbating and would get something for him to clean himself with.

The middle daughter's testimony was corroborated by the eldest daughter who stated that she saw appellant molest the middle daughter and place his private near her rear. The youngest daughter also testified that she saw appellant touch the middle daughter's "private." All of this testimony was supported by nurse Hardester's medical findings which were consistent with repeated penetration by an adult penis.

*The Youngest Daughter*

Appellant was convicted of three instances of committing lewd conduct upon the youngest daughter between September 1983 and April 30, 1986 (counts 17, 19, and 22). These convictions were supported by testimony from the youngest daughter, five years old at the time of trial, who stated that appellant touched her vagina and anus with his penis more than four times since she was four years old.

The youngest daughter further testified that she sometimes laid on her back and sometimes on her stomach while her father molested her and that her sisters were sometimes present when this occurred. She also told the jury that, like her sisters, she would occasionally get a sock or tissue for her father to clean himself. Her medical examination revealed that her vaginal opening was larger than expected for a child of her age, her hymen was absent and redness and thickening of the perianal tissue were noted; nurse Hardester testified these conditions were consistent with penetration by an adult penis.

The evidence just summarized differs significantly from that in *Van Hoek,* where the molestation occurred over a period of 10 years and the child offered only "generic and amorphous testimony" which was not linked to any specific dates. (200 Cal.App.3d at p. 814.) The court there noted that the testimony "could have detailed acts which occurred at a time before the time charged (and the statute of limitations had run) and, even if it had occurred during the time charged, there was nothing to enable the jury to tie the specific instance to a specific charge." (*Ibid.*) Thus, there was no testimony that could be connected with any of the charges.

In contrast, the children in the instant case testified (in most cases, by reference to their grade in school) how many molestations had occurred during each relevant time period set forth in the information in connection with each charge and provided additional details. Thus, there was no possibility of a conviction for conduct which occurred before the time charged or after the statute of limitations had run. The girls described what appellant did, what positions they assumed, where the events occurred and indicated that sometimes two of the girls would be watching television while the third was victimized by appellant.

Aside from specific recollections tied to holidays and birthdays which, in some cases, the eldest daughter was able to provide, the children were admittedly unable to specify the exact dates of the molestations. However, there is no requirement that the particular date be provided so long as the evidence is otherwise sufficient to permit the jury to differentiate one act from another and assess and agree upon appellant's guilt with respect to each separate act charged. The information provided by the prosecution in this case was sufficient to allow the jury to identify, examine and agree upon the individual acts underlying the separate convictions. For example, the jury might have separately examined the "first time" appellant molested the eldest daughter in the first grade or the "second time" appellant assaulted the middle daughter while she was in kindergarten. The fact that the jurors

were unable to specify the occasion by date or other particulars[5] does not undermine their ability to separate the acts and consciously evaluate appellant's guilt according to the requirements of the unanimity instruction that was read to them.

For the foregoing reasons, we conclude appellant's convictions on counts 7, 8, 13, 14, 15, 16, 17, 19, and 22 did not violate his due process rights. The evidence was sufficient to sustain the convictions and specific enough to allow the jury to agree on the individual acts supporting the convictions. The court properly denied his acquittal motion as to these counts.

. . . . . . . . . . . . . . . . . . . . .*

## DISPOSITION

For the foregoing reasons, the judgment is affirmed.

Smith, J., and Peterson, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 27, 1989. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.

---

[5] Other details of the offenses, such as the time of day they occurred, or the clothing the victims were wearing, would not have materially affected the jury's ability to separate the individual incidents, except possibly to change the terminology used (e.g., by referring to incidents as "the time [the eldest daughter] wore the red dress," as compared to "the first assault during [her] first grade.") Such details are more significant with regard to appellant's ability to defend against the charges by discrediting the girls' testimony, a concern which we have previously addressed.

*See footnote, *ante,* page 776.