[No. A077450. First Dist., Div. Two. Apr. 2, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
KIM HAROLD BURNETT, Defendant and Appellant.

[No. A085569. First Dist., Div. Div. Two. Apr. 2, 1999.]

In re KIM HAROLD BURNETT on Habeas Corpus.

COUNSEL

Carol Strickman, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, and Linda M. Murphy, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

KLINE, P. J.—Kim Harold Burnett appeals from a conviction of being a felon in possession of a firearm. He raises a number of challenges based on the underlying claim that he was tried for an offense different from the one charged in the information and addressed by the evidence at the preliminary hearing. We will conclude his conviction must be reversed due to ineffective assistance of counsel. We will additionally grant the related petition for writ of habeas corpus filed after oral argument on the appeal.

### STATEMENT OF THE CASE

Appellant was charged by information filed on May 31, 1996, with one count of being a felon in possession of a firearm (Pen. Code, § 12021, subd.

(a)(1))[1] and one count of brandishing a firearm (§ 417, subd. (a)(2)). Both offenses were alleged to have occurred on or about January 8, 1996, at Bay Point in Contra Costa County. The first count specifically alleged that appellant possessed a ".38 caliber revolver." The information further alleged that appellant had suffered two prior convictions within the meaning of section 1170.12 and had served seven prior prison terms within the meaning of section 667.5, subdivision (b).

Appellant pleaded not guilty and denied the priors. On August 14, 1996, the first day of trial, the court bifurcated trial on the priors. Appellant waived his right to a jury trial on the prior alleged in count 1 and, over objection, the court granted the prosecution's motion to amend count 1 by striking the words ".38 caliber" from the information. The court denied a defense request for an Evidence Code section 402 hearing on the relevance of testimony by prosecution witness Mark Daniels.

On August 21, 1996, the jury found appellant guilty of being a felon in possession of a firearm and not guilty of brandishing. Appellant waived his right to a jury trial on the prior conviction and prison term allegations and, after a hearing, the court found the allegations true.

On February 19, appellant, in propria persona,[2] filed motions to set aside the jury's verdict, to dismiss the count of which appellant was convicted, to reduce the offense to a misdemeanor, and to strike prior convictions. These motions were denied on February 21.

At sentencing on February 21, 1997, the prosecutor noted that one of the seven charged prior prison terms had been served concurrently with another. Appellant was sentenced to a prison term of thirty-one years to life, consisting of twenty-five years to life on count 1 plus six consecutive one-year terms for six of the section 667.5 priors. Appellant filed a timely notice of appeal on February 27, 1997.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] After a number of *Marsden* motions were denied and *Faretta* motions were withdrawn, the trial court granted a *Faretta* motion on December 27. (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]; *Faretta* v. *California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562].) At this time, the court also granted appellant's motions for appointment of a paralegal and an investigator; it subsequently granted appellant's motions for a partial trial transcript, discovery of a written statement of the taped police interview of Daniels and of records pertaining to prosecution of "Three Strikes" section 12021 cases, and release of juror information. The prosecution refused to comply with the discovery order regarding Three Strikes prosecutions, then later agreed to provide the information as an accommodation to the court, but the court concluded the information would be of minimal use to the court and appellant was not entitled to it.

After oral argument in this court, the parties were requested to supplement their briefing of the issue of ineffective assistance of counsel, one of the issues raised on the appeal. In addition to complying with this request, on January 22, 1998, appellant filed a petition for writ of habeas corpus claiming ineffective assistance of counsel and offering the supporting declaration of trial counsel. We ordered the petition to be considered with the appeal and subsequently issued an order to show cause, returnable before this court.

## STATEMENT OF FACTS

Mark Daniels, testified that on Thursday, January 4, 1996, appellant asked to stay at his house on Inlet Drive in Bay Point, Contra Costa County, for a couple of days because he and his wife were not getting along. Daniels had known appellant for about 15 years, having previously been married to a cousin of appellant's. Appellant showed Daniels a gun which Daniels took away, explaining that he had children in the house and did not want any accidents. Daniels locked the gun in a closet and locked the bullets he took out of it in a file cabinet. He described the gun as a blue steel Ruger Security Six or Speed Six, a .357 magnum revolver, with an unusual hammer that lacked a thumb catch.

On Sunday, January 7, Daniels told appellant he had to leave the next day. That same day, Daniels returned the gun and bullets to appellant and drove him to his Concord apartment. A couple of hours later, appellant called, told Daniels he and his wife were quarreling, and asked for a ride back to Daniels's neighborhood, where he would stay with someone else. When Daniels picked appellant up, appellant appeared to have had a few beers; his speech was slurred. Appellant volunteered that he had left his gun at home. Daniels dropped appellant off at the front of Daniels's house and went inside to make dinner. About 7:00 or 7:30 p.m., as Daniels was about to sit down to eat, two of his neighbors, Bill Wallace and Walter Weighill, came by looking for appellant. They were very angry; Daniels did not see a weapon on either of them. Appellant was not on Daniels's property and Daniels did not see him again that night. About 10:00 p.m., as Daniels was getting ready to go to bed, he heard three gunshots. He called the police, who offered to send a patrol car by the house. Daniels, whose house did not have a doorbell, did not hear anyone knocking on his door. The next day, Daniels asked Wallace what had happened and was told about an altercation between Wallace, Weighill and appellant. Daniels told Wallace appellant had had a

gun when he came to Daniels's house which Daniels had given back when appellant left.[3]

A few days later, Sheriff's Officer David Pascoe left his card at Daniels's house while Daniels was at work. Daniels tried to call the number on the card but was unable to get through to Pascoe. Subsequently, Michael Capuano from the district attorney's office came to the house and Daniels gave him a taped statement.

Lisa and Walter Weighill lived with their 10-year-old daughter, Alicia, at the corner of Marina Road and Inlet Drive in Bay Point, across Inlet from William Wallace and his 10-year-old daughter, Crystal. Mrs. Weighill testified that on January 8, 1996, Alicia and Crystal came into her house and told her a man who had been around the neighborhood had urinated in front of them and made lewd comments. Mrs. Weighill knew the man they referred to as Kim Burnett and identified him as appellant. The girls were initially whispering to each other, unsure whether to tell what had happened, and Crystal appeared frightened. Shocked, Mrs. Weighill told her husband, who was startled, upset but not angry, and went out to investigate. William Wallace testified that on the evening of January 8, 1996, Crystal ran into his house, scared and excited, and said there was a man peeing in front of a house down the street who had called her and her friend "little bitches." When Wallace went out to investigate, he saw Walter Weighill, furious and "hollering to beat the band."

Mrs. Weighill testified that she followed her husband outside and stood at the edge of her lawn as he talked with Crystal's father at the end of the Wallaces' driveway across the street. The two men walked down the street to Daniels's house, where appellant had been seen that afternoon. Wallace testified that he and Weighill went down the street and knocked on Daniels's door but Daniels said he did not know anything about the incident and they did not see anyone in Daniels's backyard. They figured the man had run off and went back toward their houses, where they stayed outside talking. They did not call the police.

Mrs. Weighill testified that after the men returned, Weighill went to his cousin's house a few streets away and Wallace returned to his own house;

---

[3]Daniels was "pretty sure" these events happened on Sunday rather than Monday but acknowledged if he had taken a day off he could have thought it was a Sunday. He was certain his dropping appellant off and picking him up again occurred on the same day as Wallace and Weighill looking for appellant at Daniels's house.

Weighill returned about half an hour later. Weighill testified that after looking for appellant he returned to his house, got a gun he had had for about a week, and put it in the back of his pants.[4] Wallace testified that he went inside for a minute, then came back out to talk to Weighill, who continued to be upset. As Wallace and the Weighills stood in the Weighills front yard, appellant approached on a bicycle and Mrs. Weighill said, "I believe that's him." Appellant had a can of beer in a bar on the handlebars and a gun sticking out of his back pocket.

Wallace testified that he walked to his side of the street, although appellant told him to stay by Weighill. Weighill put his hand at the middle of his lower back, indicating he had a weapon. Appellant threw a paper bag he was holding onto the ground and liquid splashed out. He approached to about three feet away from Weighill, who asked where he was going. The man said he was going to the "bikers' place," and answered affirmatively when Weighill asked, "Are you Kim Burnett?" Mrs. Weighill testified that when appellant approached he asked in a "cocky" tone of voice if they had a problem and Weighill said, "Yeah, we do." Mrs. Weighill did not recall her husband asking appellant if he was Kim Burnett.

According to Mrs. Weighill, Wallace started to move back across the street to his house and had almost made it when appellant took out the gun, pointed it at Wallace and told him not to move. He then pointed the gun at the Weighills and said he did not want them going anywhere either. She testified that her husband was remaining calm but appellant was "a little excited." Weighill told appellant to put the gun down and appellant laughed; Weighill put his hand to his back and told appellant, "we don't have to do this." This was the first time Mrs. Weighill saw her husband had a gun; he had not had a gun in his possession before this incident. Appellant put the gun back in his pocket, said, "It's okay big fellow," and backed up. Wallace went to his driveway and Mrs. Weighill went to her house to keep the girls inside. When she came back out, Weighill and appellant were talking. Appellant said, "Those little bitches are lying." Mrs. Weighill went to her neighbor's to use the telephone, as the Weighills did not have one, but no one was home. When she returned, appellant picked up his bicycle and started up the street.

By Wallace's account, appellant and Weighill got into a heated argument. Appellant pulled out a gun, stuck it in Weighill's face and said, "I can settle this." Wallace backed in between his two cars. Appellant put his gun away and when Wallace came back a bit onto the sidewalk said, "I creep around a

---

[4]Weighill's preliminary hearing testimony was read into the record—as part of the defense case—because the witness was unavailable to testify.

little fast with this thing," turning and pointing the gun "to" (but not "at") Wallace. Appellant and Weighill argued for about 10 minutes; the gun was out for only a short portion of this time. Wallace did not see Weighill pull out a gun. The argument ended after Weighill said, "Let's call the cops." Appellant said, "No, let's not call the cops," then said, "everything cool, everything cool?" and left. Wallace did not call the police.

According to Weighill, appellant approached and asked if they had a problem, to which Weighill replied they did. Appellant pulled a gun on Weighill, who reached for his own weapon but did not show it; Wallace moved to appellant's right and kept him distracted while Weighill told him they had a problem because appellant had been threatening Weighill's children. Weighill testified that appellant kept the gun pointed at him throughout the six or seven minutes of their conversation, then put it in his back pocket and rode away.

Mrs. Weighill testified that after appellant left, Wallace returned to his house; Weighill came inside, then went up the street a few houses and returned again. About two minutes after he was back in the house, they heard two gunshots. Wallace testified he heard three shots fired on the street behind his house about twenty minutes after appellant left. The Weighills, Wallace and another neighbor came outside; Wallace testified Weighill still had his gun. A sheriff's deputy arrived (about two minutes later according to Mrs. Weighill, within five minutes, according to Weighill, or about ten or fifteen minutes later according to Wallace) and they reported the incident. Wallace testified he did not hide the fact Weighill had a gun or tell the police appellant had pointed the gun at Wallace. Wallace testified he told the police he could not identify appellant because he did not get a good look at his face as appellant's back was to him. Mrs. Weighill testified that the deputy left, then about 10 minutes later 2 deputies returned and talked with the Weighills and the girls. They did not hide the fact Weighill had a gun, which was on the back of the couch. Mrs. Weighill did not tell the deputies her husband had drawn his gun. She testified that her husband was angry when he was talking to the police.

Mrs. Weighill described the gun in appellant's possession as having a brown handle, a dark black barrel and a thumb grip. Weighill testified that the gun looked like a .38-caliber revolver. Wallace described the gun as a blue steel .38-caliber revolver with about a two-inch barrel and a dark rose-colored teardrop-shaped wooden handle.

The next day, Wallace told Daniels about the incident. Daniels did not say he had seen appellant with a gun or taken and then given the gun back to

appellant. Wallace testified that the area where the incident occurred was under a street light.

Deputy Sheriff Jim Melville was dispatched to Inlet Drive about 9:50 p.m. on January 8, 1996. When he arrived in the area, he was flagged down by Mrs. Weighill, who told him about the incident with appellant. Walter Weighill, who sounded excited, upset and frustrated, told Melville appellant had pointed a .38-caliber revolver at him. Melville looked around the area for appellant but did not find him. Weighill never told Melville he had a gun that evening.

Deputy Fithian, the second officer on the scene, testified that Weighill told him he had pointed his weapon at appellant. Weighill also told Fithian he knew appellant was on parole and wanted appellant back in prison. Fithian testified Wallace told him on the night of the incident that he could identify appellant's face.

Detective David Pascoe began to investigate this case a couple of days after January 8, 1996. Wallace told Pascoe appellant had not pointed a gun at him and said he could not identify appellant because he had not seen his face. He identified the gun in appellant's possession as a .38 with a two-inch barrel. Pascoe went to Daniels's house after being advised by Weighill that Daniels might have information pertinent to the case; he left his card, with his current phone number, but subsequently learned the telephone system was not operating properly so that he was not receiving incoming calls.

Criminalist Richard Schorr testified that Ruger manufactures revolvers called the Security Six and Speed Six. It also makes a gun called an SP101 which does not have a spur on the hammer. The Security Six, no longer manufactured, came in six-inch or four-inch barrel lengths. Ruger Security Six revolvers were not manufactured with the hammer shaved down. Schorr testified that gunsmiths have been known to remove the spur of the hammer on guns, although he had never seen one altered in this way. A person familiar with firearms could tell the difference between a Ruger Security Six and a Smith & Wesson snubnose.

On January 25, 1996, Deputy Sheriff Joseph Kosmicky saw appellant drive past about 3:41 p.m. Kosmicky tried to catch up with appellant, putting on his lights, because he believed there to be an outstanding warrant for appellant's arrest. Kosmicky lost appellant in traffic, then saw him running, with his car parked. Kosmicky yelled for appellant to stop and appellant looked back, jumped over a fence and continued. He was not apprehended.

On January 29, 1996, about 6:41 a.m., Deputy Sheriff Duane Sturentz went to an address in Oakley along with other officers to execute an arrest

warrant for appellant. Appellant attempted to flee from the rear window of the one-story house. Sturentz told him to freeze and another deputy pulled him out the window. Appellant hit the ground face first and complained that he hurt his neck. He was taken to the jail and then to the hospital.

## Defense

Barry Strock testified that he had known appellant about 20 years. Appellant stayed overnight at Strock's house about seven or eight days in December 1995 and January 1996. Strock never saw appellant in possession of a firearm and would not have allowed him to stay if he had, because Stock had children, was an ex-felon himself and knew he could go to jail and lose his children if he had a firearm in the house. Strock acknowledged on cross-examination that he had not been in Bay Point from New Year's through January 8, 1996, and did not personally know whether appellant had a firearm in that area during that period of time.

Appellant testified that he had been staying at Daniels's house for about three days before January 8, 1996. During the night of January 7, while appellant was sleeping on the couch, Daniels woke him up and asked appellant to go to bed with him. Appellant refused. About 3:30 or 4:00 p.m. on January 8, appellant went outside Daniels's house to urinate because the bathroom was occupied. He attempted to conceal himself, standing with his back to the street in an area with heavy shrubs. Some kids, however, came to see what he was doing. He told them to "get out of here." They took off, then returned; appellant zipped his pants and made a "rude" statement to them: "Hey, next time you guys want to look, go get $20 from your brother because mine is this big. Now get out of here."

At 5:30 p.m., Daniels returned from work and told appellant he could not stay at the house any longer. Appellant asked for a ride to his wife's house in Concord and Daniels dropped him off there. Appellant's wife told him he could not stay; upset, appellant went for a long walk. He then called Daniels and asked for a ride back to Daniels's neighborhood, where appellant thought he could stay with a friend. On the drive back, Daniels made another pass at appellant and said appellant could stay at his house as long as he wanted if appellant went to bed with him. Appellant got angry and cursed at Daniels. Daniels dropped appellant off at his friend's house but appellant discovered no one was awake. Appellant then rode his friend's bicycle to another friend's house, where he visited but learned the house was full.

Appellant rode toward the "Club House" on Inlet Drive, a neighborhood club house. As he rode on Inlet, he heard someone say, "Hey, Kim Burnett.

Are you Kim Burnett?" Two men and a woman were standing by a house. Appellant stopped and said, "Yeah, I'm Kim Burnett. Who wants to know?" Appellant did not know anyone was looking for him or had any reason to be upset with him. One of the men, who appellant later learned was Wallace, came and stood in the street about eight or nine feet from appellant with his hand behind his back. The others, the Weighills, remained on the lawn about 30 feet away. Appellant said he did not know what the problem was and did not want any problems. Weighill said, "I think you and me do have a problem, mother fucker. I don't like you expressing yourself to my kids. I ought to kill you, you son of a bitch." As he spoke, Weighill reached to his back belt area, pulled out a gun and pointed it at appellant while walking toward him. Weighill was irate. Appellant turned and rode back down Inlet as fast as he could. After three or four seconds, he heard three gunshots from behind him. Appellant went to Keith Brock's house and spent the night there. He told Brock he had had guns pulled on him. Appellant testified that he had had three or four beers earlier in the day and was not intoxicated.[5]

Appellant testified he was not in possession of any firearm at any time during this incident. He was on active parole, one of the conditions of which was not having a firearm. Appellant, whose criminal history included convictions for robbery, burglary, assault, selling methamphetamine, being in possession of a firearm, and resisting arrest, knew that because of the Three Strikes law, carrying a weapon could result in life imprisonment. He had last spoken with his parole officer in December, before the officer went on vacation; appellant and his wife were having problems and appellant was calling the parole office and leaving messages with the secretaries as to where he was going to be staying. He was not aware there was a parole warrant out for his failure to report.[6]

---

[5]On surrebuttal, Keith Brock, who had known appellant for about 15 years, testified that appellant came to his front door in the late evening of January 8, 1996, and woke him from sleeping. Appellant was upset and said "[t]wo guys pulled guns on him." He asked to stay at Brock's house; Brock allowed him to sleep on the couch, and went back to bed. Brock did not know whether appellant had been drinking. He did not remember telling Inspector Capuano appellant had been drinking but remembered saying appellant had not been drunk.

Inspector Capuano testified on prosecution surrebuttal that he interviewed Keith Brock on August 8, 1996, and tape-recorded the conversation. When asked whether it bothered him that appellant had come to his house saying two men were after him, Brock said, "when [appellant] gets to drinking, no telling how—what kind of stories he comes up with, whether it's true or not true." Brock also said he did not see a gun on appellant that night.

[6]On rebuttal, Parole Agent David Harrington testified that parolees are directed to speak with the officer of the day if their parole officer is not available and secretaries are trained to refer such calls to the officer of the day. Appellant's files showed that appellant was instructed to call his parole officer daily with his residence plans. Appellant had contacts with the office on December 6, 14 and 22, 1995. On December 19, a request was made for a "parolee at large warrant"; the warrant issued on or about January 4, 1996.

A couple of days after the January 8 incident, appellant learned from Daniels that Weighill and Wallace had been looking for him and had said he had a gun; appellant told Daniels they had pulled a gun on him. Appellant then learned from his parole officer that he faced a potential Three Strikes sentence because someone had said he had a gun. After he learned there was a parole warrant out for him, appellant did not turn himself in because he was not "in a big hurry to go to jail for the rest of [his] life for something [he] didn't do . . . ." Appellant denied ever having a gun at Daniels's house and stated Daniels's testimony in this regard was not true. Appellant also denied ever having a gun at his wife's house, noting this was his parole address and he was subject to search of that residence at all times. He denied obtaining a weapon between the time he left Daniels's house for Concord and the time he was bicycling on Inlet Drive. He testified the testimony about his arrest was substantially correct. His neck was sprained when he was pulled out of the window by the police.

Deputy Sheriff Kenneth Fithian, the second officer to arrive at the scene on Inlet Drive on January 8, 1996, interviewed the Weighills on their front porch. Weighill said appellant had pulled a gun on him and he had pointed his gun at appellant; Mrs. Weighill never contradicted her husband's statement that he had pulled a gun on appellant. Weighill described appellant's gun as a blue steel .38-caliber with a two-and-a-half-inch barrel and brown wooden grips. Weighill told Fithian appellant was on parole and he wanted appellant back in prison. Wallace told Fithian he had clearly seen appellant's face and believed he could identify appellant. Fithian knocked on the door of Daniels's house but got no reply and did not leave a card.

## DISCUSSION

Appellant contends his conviction must be reversed because he was tried for an offense not shown by the evidence at the preliminary hearing—possession of the .357-caliber revolver Daniels described taking from appellant and returning to him when he drove appellant back to Concord on the evening of January 8. The evidence at the preliminary hearing addressed only the January 8 incident involving the altercation between the Weighills and Wallace, in which appellant allegedly possessed and brandished a .38-caliber revolver. Daniels did not testify at the preliminary hearing, and no evidence presented at the preliminary hearing suggested appellant had possessed a different gun at a different time on January 8. According to appellant, the amendment of the information to delete the words ".38 caliber" allowed the prosecutor to urge, as she did in closing argument, that appellant could be convicted of the charged offense if he possessed either the gun observed by the Weighills and Wallace during the altercation by the

Weighills' house *or* the gun Daniels claimed he took from and returned to appellant when appellant stayed at his house.

Article I, section 14, of the California Constitution provides in pertinent part: "Felonies shall be prosecuted as provided by law, either by indictment or, after examination and commitment by a magistrate, by information." Our Constitution thus requires that "one may not be prosecuted in the absence of a prior determination of a magistrate or grand jury that such action is justified." (*Jones* v. *Superior Court* (1971) 4 Cal.3d 660, 666 [94 Cal.Rptr. 289, 483 P.2d 1241].) "Before any accused person can be called upon to defend himself on any charge prosecuted by information, he is entitled to a preliminary examination upon said charge, and the judgment of the magistrate before whom such examination is held as to whether the crime for which it is sought to prosecute him has been committed, and whether there is sufficient cause to believe him guilty thereof. These proceedings are essential to confer jurisdiction upon the court before whom he is placed on trial." (*People* v. *Bomar* (1925) 73 Cal.App. 372, 378 [238 P. 758].)

Section 739 provides in pertinent part: "When a defendant has been examined and committed . . . , it shall be the duty of the district attorney of the county in which the offense is triable to file in the superior court of that county within 15 days after the commitment, an information against the defendant which may charge the defendant with either the offense or offenses named in the order of commitment or any offense or offenses shown by the evidence taken before the magistrate to have been committed." " '[A]n information which charges the commission of an offense not named in the commitment order will not be upheld unless (1) the evidence before the magistrate shows that such offense was committed [citation], and (2) that the offense "arose out of the transaction which was the basis for the commitment" on a related offense. [Citations.]' " (*People* v. *Pitts* (1990) 223 Cal.App.3d 606, 903 [273 Cal.Rptr. 757], quoting *Jones* v. *Superior Court*, *supra*, 4 Cal.3d 660, 664-665.)

An indictment or information may be amended by the district attorney at any time before the defendant pleads, and the court may allow amendment of the accusatory pleading "for any defect or insufficiency, at any stage of the proceedings." (§ 1009.) Section 1009 provides, however, that "[a]n indictment or accusation cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination."

Many cases illustrate the rule that a defendant may not be prosecuted for an offense not shown by the evidence at the preliminary hearing or arising

out of the transaction upon which the commitment was based. In *People* v. *Fyfe* (1929) 102 Cal.App. 549, 553, 555 [283 P. 378], upholding the trial court's dismissal of charges not shown by the evidence at the preliminary hearing, this court stated: "The clear purpose of these enactments is to give the accused a preliminary hearing either before a grand jury or before a committing magistrate, and to deny to the district attorney the right to force a defendant to trial before a jury upon an information which is not within the scope of the evidence taken. [¶] . . . [¶] . . . In declaring that an information 'cannot' be amended so as to charge an offense not shown by the evidence taken at the preliminary examination, the terms of the section are mandatory. They are in whole harmony with the provisions of section 8 of article I of the Constitution [now section 14] requiring an examination and commitment by a magistrate as a prerequisite to the filing of an information by the district attorney."

In *People* v. *Kellin* (1962) 209 Cal.App.2d 574 [25 Cal.Rptr. 925], the defendant was charged with grand theft on or about November 10, 1960; the evidence at the preliminary hearing showed theft of a $2,093 check on November 10, 1960. At trial, the prosecution offered evidence of theft of three additional checks on October 23 and December 8. After the prosecution's case, the district attorney successfully moved to amend the information to charge theft " 'on or about the 28th day of October through the 28th day of December, 1960.' " (*Id.*, at p. 575.) Reversing the conviction, *Kellin* held the amendment "allowed the defendant to be charged and perhaps convicted of an offense not shown by the evidence at the preliminary examination." (*Id.*, at p. 576.) The court noted that each of the checks represented a "separate and distinct transaction," not related to the check which was the basis of the order of commitment after the preliminary hearing and offered to show a distinct theft. (*Ibid.*)

In *People* v. *Winters* (1990) 221 Cal.App.3d 997 [270 Cal.Rptr. 740], the defendant was charged with possession for sale of methamphetamine and waived his right to a preliminary hearing. During trial, the prosecution was permitted to amend the information to add a charge of transportation of methamphetamine. The appellate court reversed the transportation conviction, even though the evidence showed this offense arose out of the same incident as the possession charge: "We acknowledge that respondent's motion to amend the information to add a count for transportation of methamphetamine may have come as no surprise to appellant and would have conformed the information to the proof at trial, as respondent argues here and argued below. It seems to us that is not the point nor helpful to respondent. Section 1009 specifically proscribes amending an information to charge an offense not shown by the evidence taken at the preliminary

hearing. This rule has remained virtually unchanged for over 80 years." (221 Cal.App.3d at p. 1007.) In *Winters*, because there was no preliminary hearing, the prosecution could not amend the information to add a new charge.

In *People* v. *Pitts*, *supra*, 223 Cal.App.3d at pages 903-908, multiple defendants were charged with numerous sexual acts against a number of children. The *Pitts* court reversed convictions on some 47 counts as to which evidence of the specific act charged was not adduced at the preliminary hearing of the defendant charged. *Pitts* rejected the argument that "due process is satisfied as long as the preliminary hearing evidence shows five violations of a statute and the evidence at trial shows the same number of violations of the same statute, regardless of the particulars. Such a holding would basically do away with use of the preliminary hearing transcript as a means for giving fair notice. This is not the law; a preliminary hearing transcript affording notice of the time, place and circumstances of charged offenses " ' "is the touchstone of due process notice to a defendant." ' " (223 Cal.App.3d at p. 908, quoting *People* v. *Jeff* (1988) 204 Cal.App.3d 309, 342 [251 Cal.Rptr. 135].)

*People* v. *Levy* (1973) 31 Cal.App.3d 427 [107 Cal.Rptr. 384], granted a writ of prohibition to prevent trial on an information that had been amended, after a mistrial, to allege a count of ex-felon in possession of a gun although no evidence of the prior felony had been presented at the preliminary hearing. Similarly, in *People* v. *Firestine* (1968) 268 Cal.App.2d 533 [74 Cal.Rptr. 168], the trial court properly set aside an information which inadvertently repeated two charges from an earlier information rather than setting out two distinct offenses of the same types shown by the evidence at a second preliminary hearing. Because of the prosecutor's error, the information in fact charged offenses not shown by the evidence at the relevant preliminary hearing.

In the present case, the evidence presented at the preliminary hearing showed only one incident, that described by Wallace and the Weighills, and the prosecutor initially tried the case on the theory appellant had possessed a single gun, observed both by Wallace and the Weighills and (at a different time and location) by Daniels. The jury, however, was ultimately informed appellant had possessed two different guns and could be convicted based on *either* the Wallace/Weighill incident *or* on the discrete incident described by Daniels.

The original information charged appellant with possession of a ".38 caliber revolver." In granting the prosecution's motion to amend the

information to delete the words ".38 caliber," the trial court noted, "There will be no additions simply the striking of the '.38 caliber.'" When the defense asked for a hearing on the relevance of Daniels's testimony, explaining that from the information the prosecution had provided in discovery, "it sounds like we're talking about a different gun," the prosecutor argued that the gun described by Daniels was a revolver that "looks like a .38 caliber." In her opening statement, the prosecutor implied that appellant had possessed a single gun on January, seen both by Daniels (who had taken and then given it back to appellant) and by the Weighills and Wallace (in the altercation on the lawn). The prosecutor told the jury the case was about whether appellant had illegally possessed a revolver and whether he brandished "it" in an aggressive and threatening manner. Defense counsel, in his opening statement, urged appellant never possessed any gun on January 8, stressing the different descriptions given of the guns and suggesting the witnesses had fabricated their story. Up to this point, it appeared that appellant had been charged with, and was being prosecuted for, a single incident of possession of a firearm, witnessed by several different people.

At trial, as indicated above, the evidence given by the prosecution witnesses showed two different guns possessed in two different incidents. Daniels testified he took a gun away from appellant when appellant came to stay at his house, then returned it before driving appellant to Concord on January 8. The Weighills and Wallace testified that appellant had a gun and pointed it at them during the altercation on the Weighills' lawn later in the evening of January 8. The witness descriptions clearly indicate Daniels saw a different weapon than did Wallace and the Weighills. Daniels described the gun as a .357 magnum Ruger Security Six or Speed Six revolver while Wallace and Weighill testified they saw appellant with a .38-caliber revolver; Daniels testified the gun he saw was a model with a four-to six-and-a-half-inch barrel while Wallace and Weighill testified the barrel of the gun they saw was two inches long; Daniels described the gun's hammer as having no thumb catch while Mrs. Weighill testified the gun she saw had a thumb catch on the hammer; and Daniels identified the gun as similar to pictures of a Ruger Security Six, with a rectangular handle, while Wallace described a Derringer or teardrop-shaped rounded handle.

Before closing arguments, the prosecutor asked the court to give a jury instruction on unanimity (CALJIC No. 17.01), stating, "There could be 12 that say we don't believe Wallace and the Weighills. We believe Mark Daniels. There could be 12, we don't. We need that unanimity for Count

One." The defense subsequently agreed to the jury instructions and the unanimity instruction was given.[7]

In closing argument, the prosecutor explicitly told the jury the evidence showed appellant possessed two different guns in the Daniels and Wallace/Weighill incidents and could be convicted on the basis of either one, as long as all the jurors agreed which act the conviction was based upon: "We're talking about two separate incidents that don't necessarily need to be tied in together. . . . [Y]ou can all decide that the defendant may be guilty of Count 1, based upon possessing a firearm at Mark Daniels' house, or you may think he is guilty of Court 1 and Count 2 because not only did he have the firearm at Mark Daniels' house, but he had it with Wally Weighill's, that he also brandished. . . . [A]ll 12 of you have to agree that the defendant possessed a handgun around Mark Daniels or all 12 have to agree he had a handgun, or all 12 could believe he had it with both. . . . You may find, if, on the fact that he had it with Mark Daniels, you may find it with the Wallaces or Weighills. But all 12 have to agree as to which particular group. . . . I don't ever have to prove . . . I'm not trying to prove these were the same guns. I submit to you that the defendant had a Rugar Secure 6 or some type of similar revolver when Mark Daniels took it away and gave it someone at the home, and he probably had another caliber a little bit later, but naturally he didn't have it—that gun when he came back with Mark Daniels." The prosecutor suggested appellant got rid of the gun Daniels returned to him, then got a different gun and returned to Inlet Drive. Similarly, in her rebuttal argument, the prosecutor told the jury: "He had a revolver with Mark Daniels. Something like a Rugar 6, and he had a .38 caliber that he pointed at the Weighills and Wallaces."[8]

There can be no question that the evidence in this case showed two completely different incidents, involving two separate weapons, that could

---

[7]The jury was instructed: "The prosecution has introduced evidence tending to prove that there is more than one act upon which a conviction on Count 1 may be based. The defendant may be found guilty if the proof showed beyond a reasonable doubt that he committed any one or more of such acts. However, in order to return a verdict of guilty to Count 1, all jurors must agree that he committed the same act, or acts. It is not necessary that the particular act agreed upon be stated in your verdict."

[8]Appellant raised the issue of his being prosecuted for an offense not charged in the information or shown by the evidence at the preliminary hearing in his posttrial *Marsden* (*People* v. *Marsden, supra,* 2 Cal.3d 118) motions and motions to modify the jury's verdict. In her written response to the posttrial motions, the prosecutor stated that the amendment to the information had not changed the offense with which appellant was charged: "There was no 'change' to the Information; Defendant was not charged with a separate violation of section 12021(a), for that would have been precluded by section 1009, as that evidence had not been discovered until after the preliminary hearing. Defendant was adequately notified long before trial that there was additional inclupatory [*sic*] evidence showing that he did unlawfully possess a firearm on January 8, 1996; that charge remained the same." The prosecutor acknowledged that section 12001, subdivision (k), states each weapon shall be charged as a distinct and separate offense but argued "there never was any clear evidence that Weighill and

have supported two charges of violation of section 12021, subdivision (a), if the prosecution had chosen to charge appellant with two counts and the charges had been sustained after a preliminary hearing. Section 12001, subdivision (k), provides: "For purposes of Sections 12021 . . . of this code, . . . notwithstanding the fact that the term 'any firearm' may be used in those sections, each firearm or the frame or receiver of the same shall constitute a distinct and separate offense under those sections."

Appellant, however, was charged with only one violation of section 12021, subdivision (a), and the evidence presented at the preliminary hearing portrayed only a single incident, the altercation described by Wallace and the Weighills. Accordingly, appellant was initially charged with possession of a .38-caliber revolver. Respondent (and the prosecutor below) is technically correct that the amendment of the information to delete the words ".38 caliber" did not result in a charge of an offense not shown at the preliminary hearing: The preliminary hearing testimony, of course, showed appellant was in possession of a revolver. This possession, however, was observed by Wallace and the Weighills during the altercation on the Weighills' lawn. No hint was given at the preliminary hearing that a different witness had seen appellant in possession of a different firearm at a different time on the same date. The amendment of the information, combined with the prosecutor's argument at trial and the jury instructions, allowed the jury to convict appellant solely on the basis of his possession of the gun observed by Daniels, even if it did not believe the testimony of Wallace and the Weighills. Had Daniels's testimony been presented as additional evidence that appellant was guilty of the possession observed by Wallace and the Weighills—to bolster the credibility of those witnesses by demonstrating that another person had also seen appellant with the firearm that day—there would be no problem. But a conviction based on Daniels's testimony alone would violate article I, section 14, of the California Constitution, as well as the spirit, if not the letter, of section 1009. The offense described by Daniels—possession of the .357 magnum revolver Daniels allegedly took

---

Daniels were testifying about a 'different' revolver until the end of trial; Weighill was never certain as to the actual type of weapon Defendant possessed. Out of an abundance of caution, the prosecutor and court elected to instruct the jury on CALJIC 17.01." In her oral remarks at the hearing on appellant's posttrial motions, the prosecutor stated that she and defense counsel had notice before trial of Daniels's testimony; that it was not clear until the end of trial how accurate the Wallace and Weighill descriptions of the firearms were, but that "there is no question that on January 8th the defendant had a firearm." Portraying the need for the unanimity instruction as based on the fact there were "two different theories" of appellant's possession of a firearm, the prosecution maintained: "The point is that this jury got the proper instructions. It was properly amended. It did not ever change the charge. All it did was put out there 'revolver.' We all had notice of it." The prosecutor, at this hearing, also expressed her belief that the jury had believed Daniels's testimony and disbelieved the Wallace/Weighill testimony, as appellant had been acquitted of the latter incident.

from appellant when he came to stay at Daniels's house and returned to appellant on January 8—was never the subject of a preliminary hearing at which it could be determined whether there was probable cause to believe that offense had occurred.[9]

We recognize that appellant did have notice Daniels would testify he saw appellant in possession of a firearm at a different time than the Wallace/Weighill incident: The prosecution informed appellant more than a month before trial that Daniels had seen appellant with a Ruger Security Six revolver on or around January 8, 1996. The defense was given the taped interview of Daniels by Capuano, which made clear that Daniels had not been a witness to the Wallace/Weighill incident and included Daniels's statement that appellant did not have the revolver when Daniels picked him back up after taking him to Concord. Appellant did not, however, have notice that the district attorney intended to prosecute him for possession of the weapon observed by Daniels as a distinct offense from the possession based on the Wallace/Weighill incident. (See *Gray* v. *Raines* (9th Cir. 1982) 662 F.2d 569, 574 [defendant charged with forcible rape did not have notice of charge of statutory rape despite knowledge of victim's age and consequent notice that he could have been charged with statutory rape].)

Respondent's brief either misunderstands or attempts to obfuscate the issue. According to respondent, the trial court did not abuse its discretion in allowing the prosecution to delete the "surplus language" of the information describing the revolver appellant was charged with possessing as a ".38 caliber" because the witnesses at the preliminary hearing did not give a firm description of the gun. Consequently, the amendment was an immaterial change in the description of the gun appellant possessed.

The cases upon which respondent relies demonstrate the fault in this reasoning. In *People* v. *Vance* (1956) 138 Cal.App.2d 871 [292 P.2d 552], the "immaterial" amendment changed the description of the car the defendant was charged with burglarizing from "1950 Ford 4-door sedan" to "1948 Dodge 2-door sedan." Unlike the present case, only a single incident was shown by the evidence; the defendant therefore knew the surrounding circumstances of the offense with which he was charged. In this situation, the change in description of the car was indeed immaterial. In the present case, however, the amendment, combined with the prosecutor's argument at trial and court's instruction, allowed appellant to be convicted based on a completely different incident than that shown by the evidence at the preliminary hearing.

---

[9]Contrary to the dissent's characterization, this opinion does not state or suggest a prosecutor *must* charge each possession of a separate firearm as a separate offense. The prosecution *is* limited, however, to prosecuting only offenses shown by the evidence at the preliminary hearing or transactionally related to the offense that formed the basis of the commitment order. (*People* v. *Pitts, supra,* 223 Cal.App.3d at p. 903.)

In *People* v. *Gil* (1992) 3 Cal.App.4th 653 [4 Cal.Rptr.2d 697], a case respondent claims this one falls "squarely within," the prosecution was allowed to amend the information at the end of its case to change the time periods alleged for some of the five counts of lewd conduct charged. *Gil* stated that the preliminary hearing evidence supported five counts of lewd conduct, two involving one victim and three involving the other. The appellate court found a " 'strong correspondence between the preliminary hearing testimony and dates described in the trial testimony when viewed in the light most favorable to the judgment.' " (*Id.*, at p. 658.) According to *Gil*, the amendments permitted by the trial court were "minor" and "only slightly extended the time ranges alleged in the information," while "[a]s to the substance of the offenses, . . . the testimony at trial and preliminary hearing corresponded." (*Id.*, at pp. 658-659.) In the present case, Daniels's testimony described an offense entirely separate from and unrelated to the only offense described by the evidence at the preliminary hearing.

Respondent urges that the present case also shows a "strong correspondence" between the evidence at the preliminary hearing and at trial, with the witnesses' descriptions of the guns creating only minor discrepancies in the evidence. This argument completely ignores the fact that Daniels's testimony was not presented simply to corroborate the weapon possession observed by Wallace and the Weighills but as a distinct and unrelated basis upon which a conviction could be based even without reference to the Wallace/Weighill incident. To the extent the jury could have convicted appellant solely for the possession observed by Daniels, which the prosecutor's argument and court's instructions indicated it could, the evidence upon which such a conviction would have been based was entirely different from the evidence presented at the preliminary hearing.[10]

Indeed, respondent's argument directly contradicts the express position of the prosecution at trial. Respondent argues Daniels's testimony was not offered to prove a second offense but as further evidence of a single count of possession, with discrepancies in the descriptions of the guns simply differences for the jury to consider in weighing the credibility of the witnesses. As discussed above, this simply is not the case: The prosecutor expressly told the jury the evidence showed appellant possessed two different weapons in

---

[10]Respondent states, in connection with appellant's argument that he received inadequate notice that he could be convicted based on the Daniels's incident, that appellant's argument would "require a new preliminary hearing or dismissal of charges whenever the prosecutor presents trial testimony of witnesses who did not testify at the preliminary hearing or presents trial testimony containing discrepancies." This statement is absurd. Appellant's complaint is not that the prosecution presented a new witness but that that new witness described a completely separate incident from that shown by the evidence at the preliminary hearing, and the jury was directed it could base a conviction upon that incident alone.

two separate incidents on January 8, and she and the unanimity instruction informed the jury it could convict on the basis of *either* incident. The People may not so alter their position on appeal. (See, e.g., *People* v. *Peters* (1950) 96 Cal.App.2d 671 [216 P.2d 145] [defendant who effectively conceded cause of death at trial cannot change position on appeal to argue failure of proof by prosecution]; *Horn* v. *Atchison, T. & S.F. Ry. Co.* (1964) 61 Cal.2d 602, 605 [39 Cal.Rptr. 721, 394 P.2d 561] [defendant's concession of liability at trial precluded appeal on issues regarding liability]; *Browne* v. *Superior Court* (1940) 16 Cal.2d 593, 597 [107 P.2d 1, 131 A.L.R. 276] [admission at oral argument that petition for writ of habeas corpus on behalf of incompetent person did not seek to free conservatee from restraint or discharge guardian but in fact was intended only to allow conservatee to move to a different location and ease restraints on her personal liberties with respect to mail and visitors constituted an abandonment of only proper ground for petition].)

Nor could the giving of a unanimity instruction remedy the problem in this case. ▮ A unanimity instruction serves to ensure jurors' agreement as to the facts constituting an offense when the evidence shows a greater number of violations of a charged crime than the number charged. (See, e.g., *People* v. *Avina* (1993) 14 Cal.App.4th 1303 [18 Cal.Rptr.2d 511].) ▮ Here, the jurors could have agreed on one offense, but if it was the one described by Daniels, it could not legally form the basis of the conviction. Although appellant was aware of Daniels's testimony and should have been aware this testimony *could* support a conviction for violation of section 12021, subdivision (a), the only offense shown by the evidence at the preliminary hearing was appellant's possession of a .38-caliber revolver in the altercation on the Weighills' lawn. Any possession by appellant of the .357 described by Daniels was not the subject of a preliminary hearing or magistrate's determination of probable cause. It follows that appellant could not properly be convicted of this offense.

The dissent urges that we erroneously confuse the concepts of "offense" and "incident," claiming the absence of evidence at the preliminary hearing regarding the Daniels "incident" does not preclude it from being used as the basis of a conviction for the "offense" of possession of a firearm by a felon. (Dis. opn., *post*, at pp. 190-194.) The dissent relies on a number of cases, mostly involving child molestation prosecutions, which hold that a single "offense" may be proven by evidence of a number of "incidents" or "acts," so long as the prosecution elects which act is to be the basis of conviction or the jury is given a unanimity instruction.

These cases simply do not address the problem presented when one or more of the "acts" upon which conviction is sought was not described by the

evidence at the preliminary hearing. ██ Unquestionably, "when the evidence tends to show a larger number of distinct criminal acts than have been charged" a conviction will be upheld if the prosecution elected which act it would rely upon for each allegation or if the jury was given a unanimity instruction. (*People* v. *Gear* (1993) 19 Cal.App.4th 86, 90 [23 Cal.Rptr.2d 261]; *People* v. *Salvato* (1991) 234 Cal.App.3d 872, 879-880 [285 Cal.Rptr. 837]; *People* v. *Moreno* (1989) 211 Cal.App.3d 776, 786 [259 Cal.Rptr. 800]; *People* v. *Gordon* (1985) 165 Cal.App.3d 839, 853 [212 Cal.Rptr. 174]; *People* v. *Dunnahoo* (1984) 152 Cal.App.3d 561, 568-570 [199 Cal.Rptr. 796]; *People* v. *Diedrich* (1982) 31 Cal.3d 263, 280-281 [182 Cal.Rptr. 354, 643 P.2d 971].) ██ These cases cited by the dissent, however, do not discuss the question of a court's authority to convict of an offense not shown by the evidence at the preliminary hearing, presumably because none involved a claim of error on this basis.[11]

The dissent also maintains that the evidence which must be presented at the preliminary hearing is only evidence of the "offense" charged and not "details of the particular incident upon which the offense is based." (Dis. opn., *post*, at p. 194, italics omitted.) Thus, the dissent quotes the holding of *People* v. *Jones* (1990) 51 Cal.3d 294, 317 [270 Cal.Rptr. 611, 792 P.2d 643], that a " 'defendant has no right to notice of the specific time or place of an offense, so long as it occurred within the applicable limitation period.' " (Dis. opn., *post*, at p. 195.) To the same effect, the dissent notes the rule stated in *People* v. *Luna* (1988) 204 Cal.App.3d 726, 748 [250 Cal.Rptr. 878], disapproved on other grounds in *People* v. *Jones*, *supra*, 51 Cal.3d 294, 313, that " '[s]o long as the evidence presented at the preliminary hearing supports the number of offenses charged against a defendant and covers the time frame or time frames charged in the information, a defendant has all the notice the Constitution requires.' " (Dis. opn., *post*, at p. 195.)

As we have discussed, however, the issue in the present case is *not* notice of each witness's testimony but notice of the offense being prosecuted. *Jones*

---

[11]*People* v. *Gear*, *supra*, 19 Cal.App.4th at page 95, discussed the preliminary hearing testimony in that case only to state that the preliminary hearing testimony of a police officer was sufficiently similar to the victim's testimony at trial to provide the defendant with notice of a charge of a continuous course of sexual abuse. *People* v. *Gordon*, *supra*, 165 Cal.App.3d at page 870, noted the rule that "an information cannot charge offenses not shown by the evidence at the preliminary examination" and discussed the role of the preliminary hearing in giving a defendant notice of the criminal acts against which he or she must defend. In *People* v. *Salvato*, *supra*, 234 Cal.App.3d at page 884, a case involving threats by the defendant to his former wife, the court noted that some of the specific acts described at trial had not been described at the preliminary hearing and concluded the defendant had not been given notice of these acts. While its discussion implicitly assumes that, given adequate notice, the defendant could have been convicted on the basis of such acts, *Salvato* does not directly address this question.

and *Luna*, like most of the other cases cited by the dissent, are sexual abuse cases involving testimony by a given victim about acts occurring over a period of time that cannot necessarily be tied to specific dates or locations. Their statements must be read in this context. *Jones* began its discussion by noting that "[c]hild molestation cases frequently involve difficult, even paradoxical, proof problems. A young victim . . . , assertedly molested over a substantial period by a parent or other adult residing in his home, may have no practical way of recollecting, reconstructing, distinguishing or identifying by 'specific incidents or dates' all or even any such incidents." (51 Cal.3d at p. 305.) Immediately before the portion of *Luna* cited by the dissent, the *Luna* court explained: "As Justice Sims points out in his concurring opinion in *People* v. *Gordon, supra,* 165 Cal.App.3d 839, 870-871: 'These rules make it clear that an information plays a limited but important role: it tells a defendant what kinds of offenses he is charged with (usually by reference to a statute violated), and it states the number of offenses (convictions) that can result from the prosecution. But the time, place and circumstances of charged offenses are left to the preliminary hearing transcript; it is the touchstone of due process notice to a defendant. [¶] In light of the notice function played by the preliminary hearing transcript, a prosecutorial election is unnecessary to advise defendant of the criminal acts he must defend against. . . . [A]t a minimum, a defendant must be prepared to defend against all offenses of the kind alleged in the information as are shown by evidence at the preliminary hearing to have occurred within the timeframe pleaded in the information.' " (204 Cal.App.3d at pp. 747-748, italics omitted.) *Jones*, also quoting *Gordon*, noted that a "defendant has no right to notice of the specific time or place of an offense, so long as it occurred within the applicable limitation period. 'Beyond that, . . . the prosecution clearly has no duty to provide more explicit notice than human nature and science permit.' " (51 Cal.3d at p. 317, quoting *People* v. *Gordon, supra,* 165 Cal.App.3d at p. 868.)

*Jones* and *Luna* obviously contemplate that evidence at the preliminary hearing will at least generally describe the incidents upon which criminal conduct is predicated, subject to the inherent limitations of the subject matter with which those cases dealt. The present case does not involve a single witness describing separate acts of a similar nature, but rather distinct witnesses to distinct incidents that could have been (although they were not required to be) charged as separate offenses. The prosecution began this case by claiming all the witnesses saw appellant with the same gun, on separate occasions within the same day. During the trial, after the prosecution's case with respect to the Wallace/Weighill incident was torn apart by inconsistencies between the witnesses' accounts and between their trial testimony and statements to the police, evidence the witnesses were angry with appellant

because of the incident with their children and that Weighill came to the confrontation armed, and Weighill's refusal to appear at trial, the prosecution totally altered its position, urging the two sets of witnesses had observed different guns and appellant could be convicted if the jury found *either* that he possessed the weapon described by Wallace and the Weighills *or* the weapon described by Daniels. "An accused person is entitled to know, as far as is practically possible, just which of his or her acts the prosecution claims were criminal. Where the prosecutor is aware that the evidence he or she plans to present will include several distinct acts, any one of which might arguably constitute the crime charged, there is no reason he or she should be allowed to play 'hide the ball' with the defense." (*People* v. *Salvato, supra,* 234 Cal.App.3d at p. 880.)

It is one thing to hold, as do the cases upon which the dissent relies, that as a matter of due process, a defendant may be convicted of any offense of which he or she is given notice by the information combined with the preliminary hearing and other discovery. It is another thing altogether to hold that a defendant may be convicted upon proof of any incident giving rise to the same "offense" as charged in the information and shown at the preliminary hearing, regardless of the absence of connection between the proven incident and that shown at the preliminary hearing. We cannot believe the rule that a defendant "has no right to notice of the specific time or place of an offense, so long as it occurred within the applicable limitation period" (*People* v. *Jones, supra,* 51 Cal.3d at p. 317), stated in the context of generic testimony in cases of ongoing sexual abuse, was meant to include the situation where the prosecution changes horses in midstream by substituting a different "act" for the single "act" described by the evidence at the preliminary hearing. In the absence of any discussion in the cases of the requirement that a defendant not be convicted of an offense not shown by the evidence at the preliminary hearing, we decline to read these cases as authorizing any deviation from this rule.[12]

Respondent urges that appellant could have suffered no prejudice from the addition of the Daniels gun incident as a basis for conviction because his

---

[12]The dissent's example of a "felon simultaneously in possession of not one but two similar-appearing guns," who over a period of 12 hours "periodically displays one or the other of these weapons to different witnesses in the same neighborhood" (dis. opn., *post,* at p. 199) depicts a dramatically different case than the one before us. The dissent's example demonstrates what is really a continuous crime, with multiple displays of the same weapons in close temporal proximity to each other. While this example serves to illustrate the point that scenarios may be conjured in which it would be difficult to draw the line between discrete offenses and a continuous offense reflected in multiple incidents, the line is not difficult to draw on the facts of the present case. Here, as has been repeatedly stated, two different sets of witnesses described two discrete events, involving different weapons, which occurred at different times of day, in different locations and under different circumstances. Presentation of evidence of one of the incidents at the preliminary hearing simply could not authorize conviction on the basis of evidence of the other. (See *People* v. *Kellin, supra,* 209 Cal.App.2d

defense was to disclaim possession of any weapon, not solely to disclaim ownership of the type of weapon observed by Wallace and the Weighills. It is as a matter of law irrelevant whether a defendant is prejudiced by being prosecuted for an offense not shown by the evidence at the preliminary hearing. In concluding the conviction for an offense added by amendment of the information during trial had to be reversed because there had been no preliminary hearing at which evidence of the new offense was presented, the court in *People* v. *Winters, supra,* 221 Cal.App.3d at pages 1006-1007, quoted *People* v. *Bomar, supra,* 73 Cal.App. at page 378: " 'Neither do we think that section 4½ of article VI of the [C]onstitution [now article VI, section 13] is applicable in the present case. Before any accused person can be called upon to defend himself on any charge prosecuted by information, he is entitled to preliminary examination upon said charge, and the judgment of the magistrate before whom such examination is held as to whether the crime for which it is sought to prosecute him has been committed, and whether there is sufficient cause to believe him guilty thereof. These proceedings are essential to confer jurisdiction upon the court before whom he is placed on trial. To say that he was accorded a fair trial upon an information filed against him without a substantial compliance with these jurisdictional requirements, and, therefore, that there had been no miscarriage of justice, hardly meets the situation. *Such an argument would apply with equal force to the validity of the conviction upon an information filed by the district attorney in a case where no preliminary examination at all had been held.* Such practice would result, in legal effect, in wiping out all provisions of the [C]onstitution and the Penal Code providing for a preliminary examination, and in clothing the district attorney with unlimited authority to file information against whomsoever in his judgment he might consider guilty of crime. We do not believe that it was ever the intention to extend the scope of section 4½ of article VI of the [C]onstitution to any such limits.' (*People* v. *Bomar, supra,* 73 Cal.App. at p. 378, italics added.)"

Cases involving prosecutions by indictment reach the same conclusion. In *Stirone* v. *United States* (1960) 361 U.S. 212 [80 S.Ct. 270, 4 L.Ed.2d 252], the defendant was indicted and convicted of unlawfully interfering with interstate commerce in violation of a federal statute. The indictment charged an effect on interstate commerce through interference with the importation of sand into the State of Pennsylvania. The trial court then allowed the prosecution to introduce evidence of interference with steel shipments out of Pennsylvania and charged the jury the interstate commerce aspect of the case could be based on either the importation of sand or the exportation of steel.

---

574 [conviction reversed where evidence at preliminary hearing showed theft of specified check on specified date but evidence at trial showed theft of additional checks on other dates].)

Noting the rule that "charges may not be broadened through amendment except by the grand jury itself," *Stirone* held the trial court's action had the effect of amending the indictment. (*Id.*, at p. 216 [80 S.Ct. at p. 272].) The court held that deprivation of the defendant's "substantial right to be tried only on charges presented in an indictment returned by a grand jury" was "far too serious to be treated as nothing more than a variance and then dismissed as harmless error." (*Id.*, at p. 217 [80 S.Ct. at p. 273].)

Similarly, in *U.S.* v. *Leichtnam* (7th Cir. 1991) 948 F.2d 370, the defendant was charged in an indictment with use of a specified model and type of rifle during drug trafficking. At trial, the prosecution introduced not only that rifle but also two handguns found during the same search in a different part of the defendant's home from the rifle. The jury was instructed that the firearm count could be based on proof the defendant intentionally used or carried a "firearm," not limited to the one specified in the indictment. *Leichtnam* held the introduction of the handguns, combined with the jury instructions, "impermissibly amended the indictment" and reversed the conviction. (*Id.*, at pp. 380-381.)

██ Despite the clear illegality of prosecuting or convicting appellant of an offense different from and not transactionally related to the one shown by the evidence at the preliminary hearing, however, defense counsel inexplicably did not object at the point it became clear the prosecutor was going to urge conviction based on the Daniels incident as an alternative to conviction based on the Wallace/Weighill incident. Defense counsel objected to the initial amendment but failed to state a basis for the objection; failed to object to the admission of Daniels's testimony, the giving of the unanimity instruction or the prosecutor's closing argument; and failed to demur to the amended information, request a continuance, or move for acquittal on the basis of the constructive amendment. ██ Consequently, respondent urges appellant waived the issue. Appellant in turn contends the waiver doctrine is inapplicable, as the constitutional requirement that a preliminary hearing and magistrate's finding of probable cause precede any felony prosecution is jurisdictional. (*People* v. *Pitts, supra,* 223 Cal.App.3d at p. 903; *People* v. *Bomar, supra,* 73 Cal.App. at p. 378; *People* v. *Firestine, supra,* 268 Cal.App.2d 533, 536, fn. 3.) ██ "Jurisdictional error is not waived by failure to object earlier." (*Andrus* v. *Estrada* (1995) 39 Cal.App.4th 1030, 1042 [46 Cal.Rptr.2d 300]; see *In re Heraclio A.* (1996) 42 Cal.App.4th 569, 573 [49 Cal.Rptr.2d 713] [subject matter jurisdiction cannot be conferred by consent, waiver or estoppel]; *People* v. *Blakeman* (1959) 170 Cal.App.2d 596, 598 [339 P.2d 202].)

The term "jurisdiction" has many meanings: While in its "most fundamental or strict sense," it means "an entire absence of power to hear or determine

the case, an absence of authority over the subject matter or the parties," the term may also refer to the situation where a court that has jurisdiction over the subject matter and parties "has no 'jurisdiction' (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites." (*Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 288 [109 P.2d 942, 132 A.L.R. 715].) "Action 'in excess of jurisdiction' by a court that has jurisdiction in the 'fundamental sense' (i.e., jurisdiction over the subject matter and the parties) is not void, but only voidable." (*Conservatorship of O'Connor* (1996) 48 Cal.App.4th 1076, 1088 [56 Cal.Rptr.2d 386], italics omitted.) "The doctrines of waiver and estoppel apply only to *voidable* acts (i.e., to acts which are in excess of these other kinds of jurisdiction)." (*Jovine* v. *FHP, Inc.* (1998) 64 Cal.App.4th 1506, 1527, fn. 26 [76 Cal.Rptr.2d 322], italics in original; *Conservatorship of O'Connor*, *supra*, 48 Cal.App.4th at p. 1088.)

 The case law is consistent in reiterating that a superior court lacks authority to try a defendant for a felony charged by information with an offense not previously subjected to a preliminary hearing. Violation of this limitation on the superior court's power, however, would constitute action in excess of jurisdiction—waivable error—and not nonwaivable subject matter jurisdiction. (See *People* v. *Superior Court (Marks)* (1991) 1 Cal.4th 56, 64 [2 Cal.Rptr.2d 389, 820 P.2d 613] [noting where case "proceeds under a 'fatally defective' indictment, 'if the court had jurisdiction of the cause and the party, its judgment is not void, but only voidable' "]; *In re Hess* (1955) 45 Cal.2d 171, 175 [288 P.2d 5] [conviction of offense not charged in information or necessarily included in charged offense is act "in excess of [the trial court's] jurisdiction"].) We conclude appellant waived this issue. (See *People* v. *Newlun* (1991) 227 Cal.App.3d 1590, 1604 [278 Cal.Rptr. 550] [waiver of due process notice argument where defendant convicted of offense not shown at preliminary hearing].)

 This does not end the discussion, however, because appellant further urges his attorney's failure to further object constituted ineffective assistance of counsel. "The burden of proving ineffective assistance of counsel is on the defendant. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 . . . .) To establish constitutionally inadequate representation, the defendant must show that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's deficient representation subjected the defense to prejudice, i.e., there is a reasonable probability that but for counsel's failings the result would have been more favorable. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-218 . . . ; *People* v. *Fosselman* [1983)] 33 Cal.3d [572], 584; *People* v. *Pope*, *supra*; see *Strickland* v. *Washington* (1984) 466 U.S. 668, 687-696 . . . .)" (*People* v. *Babbitt* (1988) 45 Cal.3d 660, 707 [248 Cal.Rptr. 69, 755 P.2d 253].)

There is a " '*strong presumption* that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action *"might be considered sound trial strategy."* ' " (*People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1215 [249 Cal.Rptr. 71, 756 P.2d 795], quoting *Strickland* v. *Washington* (1984) 466 U.S. 668, 689 [104 S.Ct. 2052, 2065, 80 L.Ed.2d 674], italics added in *Bunyard*.) "Where the record shows that the omission or error resulted from an informed tactical choice within the range of reasonable competence . . . the conviction should be affirmed." (43 Cal.3d at p. 1215.) The determination whether counsel's performance was deficient "generally must be made with deference to avoid the dual pitfalls of second-guessing counsel's tactics and chilling vigorous advocacy by tempting counsel 'to defend himself against a claim of ineffective assistance after trial rather than to defend his client against criminal charges at trial . . . .' " (*In re Cordero* (1988) 46 Cal.3d 161, 180 [249 Cal.Rptr. 342, 756 P.2d 1370], quoting *People* v. *Ledesma* (1987) 43 Cal.3d 171, 216 [233 Cal.Rptr. 404, 729 P.2d 839].) "However, 'deferential scrutiny of counsel's performance is limited in extent and indeed in certain cases may be altogether unjustified. "[D]eference is not abdication" [citation]; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions.' " (*In re Cordero, supra,* 46 Cal.3d at p. 180, quoting *People* v. *Ledesma, supra,* 43 Cal.3d at p. 217.)

 In the present case, defense counsel objected to the amendment of the information without stating a ground for the objection, then requested an Evidence Code section 402 hearing on the relevance of Daniels's testimony on the ground that the prosecution's information suggested Daniels was talking about a different gun. The trial court denied the motion after the prosecutor represented there was only one gun in question. Daniels's testimony was subsequently presented at trial without objection. Assuming that at this point it still appeared Daniels's testimony was being presented to corroborate the possession described by Wallace and the Weighills, when the prosecutor requested a jury instruction on unanimity it should have been apparent to defense counsel that the jury was to be told it could convict appellant on the basis of the Daniels incident alone. The jury was expressly so informed in the prosecutor's closing argument. Defense counsel, however, agreed to the jury instructions and did not object to the prosecutor's argument. Appellant's suggestion that the initial objection to the amendment of the information and request for a hearing regarding Daniels's testimony were sufficient to preserve his claim that he was improperly convicted of an offense not shown by the evidence at the preliminary hearing ignores the changed posture of the case during the course of trial. When the initial

objection and request were made, it appeared appellant had been charged with, and was being prosecuted for, a single incident of possession of a firearm, witnessed by several different people. By the time the unanimity instruction was requested and closing argument made, it was clear appellant was being prosecuted for *either* of two separate incidents, one of which was never the subject of the preliminary hearing.

Since appellant could not constitutionally be prosecuted for or convicted of an offense not shown by the evidence at the preliminary hearing, defense counsel should have objected or taken some action to protect appellant's rights, at least when it became clear the jury was going to be asked to convict on the basis of either the incident shown by the preliminary hearing evidence *or* the incident not addressed at the preliminary hearing. Given the constitutional mandate discussed above, " 'there simply could be no satisfactory explanation' " (*People* v. *Ledesma, supra,* 43 Cal.3d at p. at p. 218, quoting *People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]) for counsel's failure to object. Indeed, in his declaration submitted with appellant's petition for writ of habeas corpus, trial counsel states that he had no tactical reason for failing to make additional objections to the jury being allowed to deliberate and convict on the Daniels incident. Rather, trial counsel states he believed he had preserved the issue for appeal by his *in limine* motion to exclude the Daniels evidence and opposition to the amendment of the information, believed further objection would have been futile, and with the benefit of hindsight and briefing of appellate counsel, had become aware he "perhaps should have made various objections at the end of the trial to the jury's deliberating on the Daniels' incident." Trial counsel further states that although he expected the prosecution to offer evidence of the Daniels incident, he was surprised by the prosecutor's closing argument and the jury being allowed to vote on the Daniels incident and was unprepared to respond to these surprising developments.

Had defense counsel objected at the point it became clear the jury was to be asked to convict appellant on the basis of *either* the Daniels incident *or* the Wallace/Weighill incident, the trial court could have instructed the jury that the Daniels incident in and of itself could not be the basis of a conviction. Indeed, it follows from our discussion above that the court would have had no alternative but to give such an instruction, to avoid the possibility of appellant being convicted of an offense not shown by the evidence at the preliminary hearing.

Respondent urges, however, that we may not find ineffective assistance of counsel because the trial court's other rulings demonstrate an objection at

this point in the trial would have been futile. (*People* v. *Price* (1991) 1 Cal.4th 324, 387 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People* v. *Weston* (1981) 114 Cal.App.3d 764, 780 [170 Cal.Rptr. 856].) According to respondent, as well as the declaration of trial counsel, trial counsel's belief that further objection would have been futile was borne out by the trial court's subsequent denial of appellant's *Marsden* and new trial motions, in which appellant relied in part on the issue of his having been prosecuted for the offense described by Daniels when no evidence of this offense had been presented at the preliminary hearing.

Appellant does not raise the denial of his new trial motion as a ground for appeal. Given the obvious illegality of prosecuting and convicting appellant of an offense not shown by the evidence at the preliminary hearing, however, it would be difficult not to conclude the trial court abused its discretion in rejecting appellant's challenges to the jury's verdict. To excuse counsel's failure to object because subsequent events showed the trial court would have *erroneously* overruled the objection would be to falsely exonerate representation that fell below an objectively reasonable standard of conduct and, as will be discussed, prejudiced the defendant. It is one thing to say counsel cannot be faulted for failing to make an objection that would have been futile because the trial court, acting reasonably, would have overruled it. It is quite another to allow the trial court's error to insulate counsel's performance from review. While we recognize that defense counsel was put in a difficult position by the prosecution's end-of-trial change of strategy and the trial court's apparent acceptance of that change, we cannot find it met an objective standard of reasonableness.

Consideration of the jury's verdict leads to the conclusion there is a reasonable probability a more favorable result would have been reached if counsel had objected and the court had given the jury a limiting instruction. Appellant was acquitted of the brandishing charge that arose out of the Wallace/Weighill incident. There is no apparent basis upon which a rational juror could have determined that Wallace and the Weighills were telling the truth as to appellant's possession of the firearm but not as to his pointing it at Wallace and the Weighills.[13] Mrs. Weighill testified that appellant pointed the gun at Wallace and then at the Weighills, telling them not to move; Wallace testified appellant pointed the gun at Weighill's face in the course of a heated argument and pointed it "to" Wallace when he started to move away from the scene; and Weighill testified at the preliminary hearing that

---

[13]We do not consider the juror affidavits submitted by appellant to demonstrate the basis for the conviction as consideration of such affidavits would violate the rule that no evidence is admissible "concerning the mental processes by which [the verdict] was determined." (Evid. Code, § 1150.)

appellant pulled a gun on him when Weighill said they had a problem because appellant had been threatening Weighill's children, and kept it pointed at Weighill throughout their six- or seven-minute conversation. There can be little question this testimony, if believed, demonstrated the elements of brandishing.[14] Accordingly, the jury's acquittal on the brandishing charge strongly suggests it did not believe the witnesses to this incident and convicted appellant of possession on the basis of the Daniels incident. This conclusion is bolstered by the fact the prosecution evidence regarding the Wallace/Weighill incident was weak: Aside from factual inconsistencies between the witnesses' accounts, such as Weighill stating appellant kept his gun pointed at Weighill throughout their encounter and Wallace testifying the gun was out only a small portion of the encounter, the witnesses were angry with appellant because of the earlier incident with their children; Weighill came to the confrontation armed; the witnesses testified Weighill did not pull his gun on appellant, but Weighill told the police on the night of the incident that he had pointed his gun at appellant; Weighill refused to appear to testify at trial; and Wallace testified he could not identify appellant because he had not gotten a good look at his face, but had told the police on the night of the incident that he could identify appellant. During deliberations, the jury requested a re-reading of Daniels's entire testimony and asked for the date Daniels was interviewed by Capuano. Indeed, the prosecutor, in opposing appellant's motion to modify the jury verdict, argued that substantial evidence supported the verdict solely by reference to the evidence of the Daniels incident; at the sentencing hearing, the prosecutor acknowledged appellant was convicted on the basis of Daniels's testimony. It follows that there is at least a reasonable probability appellant would have been acquitted of the possession count as well if the jury had been told the conviction could not be based upon the Daniels incident.

The conviction must be reversed. The petition for writ of habeas corpus is granted.[15]

**LAMBDEN, J., Concurring.—** I am constrained to separately concur because the vigor of the debate between

---

[14]Section 417, subdivision (a)(2), provides in pertinent part: "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses the same in any fight or quarrel is guilty of a misdemeanor, punishable by imprisonment in a county jail for not less than three months."

[15]Our determination that appellant's conviction must be reversed due to ineffective assistance of counsel makes it unnecessary for us to reach appellant's alternate arguments seeking reversal of the conviction. We note, however, that respondent has conceded the court should have imposed only five enhancements under section 667.5, as appellant served only five prior separate prison terms within the meaning of that statute. Respondent has also conceded appellant was entitled to three additional days of presentence credit.

my colleagues may suggest the need for a new rule, where none is required, and create an impression of confusion in the law where none exists.

The potential for confusion results in part from the nature of Penal Code section 12021, which creates a status offense which cannot be characterized by identification of any particular victim. It is enough to sustain a conviction under this section that a defendant is found to be a convicted felon simply possessing a firearm; and both the nature of the possession and "firearm" are broadly defined. The lack of an identifiable victim allows the dissent to argue that the "offense" alleged in the information, and described by the evidence produced at the preliminary hearing, can result in a sustainable guilty verdict even if the evidence adduced at the trial describes a different gun observed by different witnesses at a different time and place. My dissenting colleague concludes that because the offense is a simple matter of "felon plus gun equals conviction" any combination of evidence can suffice to support the conviction, even if such evidence describes circumstances neither described in the information nor mentioned at the preliminary hearing. The only limitation apparently placed by the dissent upon this broad rule would be the requirement that the offense charged occur "on the same day and in the same neighborhood." (Dis. opn., *post*, at p. 191.)

The issue presented by this case is the definition of what may constitute separate "offenses" under the statute for purposes of the due process requirement for a preliminary hearing to support each offense charged. I conclude that no usable distinction between offenses can be described solely by reference to the date and general location of the offense or by identification of the particular firearms possessed. I agree with my colleague in the majority that the existence of separate offenses must be determined by comparing the evidence presented at the preliminary hearing with the evidence ultimately presented at trial. The test is whether the defendant had fair notice of what the witnesses could be expected to say at trial pertinent to the charged offense in light of the evidence considered at the preliminary hearing. Subsequent discovery of evidence to support a different chargeable offense—as differentiated from disclosure of variant details of the same charged offense—cannot substitute for the required preliminary hearing.

Confusion also results from the quibbling of the dissent over the lead opinion's use of the term "incident" to differentiate the uncharged offense described at this trial from the wholly different evidence adduced at the preliminary hearing. There is nothing shifty in the use of both terms. The majority does not attempt to contend that either of the "incidents" (or occurrences, events, episodes, etc.) could not have been charged as an offense. The majority simply contends that the prosecution could not support

the charged offense with one set of facts adduced at the preliminary hearing and then produce a different set of facts at trial.

These facts are much more than amply described by my colleagues. The dissent, in particular, stresses that it does not matter whether the same pistol was possessed on two occasions or that there were two very similar weapons. I agree that, because the statute is violated by the possession of any firearm satisfying the broad definition, just about any firearm will suffice. My dissenting colleague also correctly observes that the prosecution is not required to charge all possible offenses and that evidence suggesting possession of two guns could, under some circumstances, result in only one charged offense. It is also undisputed that once there is evidence of possession of any qualifying firearm, the details of its identification are largely a matter testing the credibility of the witnesses. The only relevance of the evidence of multiple guns in this discussion goes to the tangential question of whether the prosecutor might have charged multiple offenses, as permitted by the amendment of Penal Code section 12001 in 1994, to allow a separate charge for each firearm possessed at any given time.

However, the ability of the prosecutor to charge multiple offenses under the statute does not mean that there is no limit to the number of offenses which can be presented to the jury under the aegis of a single charge. It is conceded by both the lead and dissenting opinions that the prosecutor could have charged more than one offense based on the two available sets of evidentiary facts. Instead, the information described a particular .38-caliber revolver, and the preliminary hearing disclosed witnesses, Wallace and the Weighills, who testified that appellant displayed that particular weapon in a particular place on January 8, 1996. At trial, the prosecutor wanted to use an entirely distinct set of facts and another witness, Daniels, to describe a different pistol possessed in a different place at another time. In order to eliminate the conflict between the information and the evidence presented by Daniels, the prosecutor asked at trial to amend the information to simply remove the specification of the caliber of the revolver. From these facts the dissent argues not only that there were two distinct offenses which could have been charged, but also that *"the offense is the same—possession of a gun by a felon; all that is different is the gun and the witnesses to its possession!"* (Dis. opn., *post*, at p. 191.) The fact that the time and place of the possession, as well as the gun and the witnesses, were shown to be different at trial, is dismissed as trivial by the dissent. The only logical explanation for this view is that the offense is regarded by the dissent as a "continuing" offense. In other words, during the entire time frame within which the defendant possesses a gun, any one of a indefinite number of "evidentiary snapshots" could be used to convict him.

My dissenting colleague adopts this logic in concluding that the result of the amendment of the information at trial was inconsequential: "The information in this case, as amended, advised appellant that he was charged with being a felon in possession of a revolver. He also knew that the prosecution was addressing, and addressing only, such possession on January 8, 1996, in Bay Point, Contra Costa County. The only thing he didn't know, from the combination of the preliminary hearing testimony and the information, was whether the charge encompassed both revolvers and both sets of witnesses or, if not, which one."[1] (Dis. opn., *post*, at p. 195.) Of course, under the facts thus relied upon by the dissent, the appellant did not know the potential combination of these facts until trial. This is because the second witness, Daniels, who would describe possession of a different gun at a different time and location, did not testify at the preliminary hearing; the appellant only learned of this potential testimony when it was disclosed by the prosecution a relatively short time before trial. However, the significance of this later disclosed testimony could not have been fully apparent until the amendment at trial. Moreover, the requested amendment itself suggests a belated realization by the prosecution that an offense different from the one described at the preliminary hearing would be argued at trial.

The dissent relies primarily upon the Supreme Court's ruling in *People* v. *Jones* (1990) 51 Cal.3d 294 [270 Cal.Rptr. 611, 792 P.2d 643], one of several child molestation cases discussed in both the lead and dissenting opinions, that considered the specificity of the evidence required to be adduced at the preliminary hearing. I also rely on the reasoning of *People* v. *Jones* and I do not disagree with the *Jones* opinion's citation of *People* v. *Luna* (1988) 204 Cal.App.3d 726 [250 Cal.Rptr. 878] for the proposition that due process does not require a high degree of specificity in the evidence presented at the preliminary hearing. (Dis. opn., *post*, at pp. 195-196; lead opn., *ante*, at pp. 175-178.) But it must be observed that these sexual molestation cases, which are factually problematic on many levels, are easily distinguished because they uniformly involved relatively minor variances in the factual details of offenses committed against single victims and did not charge a "status" offense of the sort alleged here. Also, the molestation cases

---

[1]Under the circumstances the amendment may have seemed relatively inconsequential, possibly explaining defense counsel's rather mild objection and request for a hearing regarding the relevance of the Daniels testimony because "it sounds like we are talking about a different gun." However, I am reminded of Mark Twain's observation that there is considerable difference between the lightning and the lightning bug. As noted in the lead opinion, by the time the opening statements were completed, it still appeared that appellant faced a single charge of an offense witnessed by several people, rather than two distinct charges which would be described by two different sets of evidence. Even so, the subtlety of the amendment cannot satisfactorily explain counsel's failure to object to the presentation of evidence of an offense not described at the preliminary hearing.

involve repeated and distinct offenses rather than the sort of "continuing" offense proposed by the dissent. My dissenting colleague has not read closely enough the limiting language of his own citation of the opinion in *People v. Jones, supra,* 51 Cal.3d at page 312., which begins: " '*So long as the evidence presented at the preliminary hearing supports the number of offenses charged against defendant . . . .' "* (Italics added.) My point is precisely that the evidence presented at the preliminary hearing did not support the number of charges brought against this defendant at trial.

The conclusion of the dissent seems to suggest that the unusual nature of the Penal Code section 12021 offense should allow a prosecutor to simply allege that "between such-and-such dates in the vicinity of so-and-so" the defendant was a felon who had a gun. The logic of the dissent suggests that, so long as he has at least one gun, he is continually committing the offense, and that if he has two guns he is continually committing two offenses. And it follows, according to the dissent, that so long as the defense is at some point provided a list of witnesses who might testify to support this vague charge, the constitutional requirements for due process would be satisfied. Here, of course, the information was restricted in time to a single day, January 8, 1996, and to a single location, Bay Point. But, if "one town, one day" is to be the measure, would the dissent permit an allegation that a defendant was a felon in possession of a firearm on a particular day "in the City of Los Angeles?" Would "between January 8 and January 10, in the City of Mendocino" suffice? The dissent does not even describe any rule sufficient to satisfy due process even with reference to allegations of different offenses within a single 24-hour period at a single location. I submit that such a rule is neither practical nor constitutionally permissible, at least under the circumstances presented by this record.

Could the prosecution in this case have amended the information to present evidence of yet more occasions where hitherto undisclosed witnesses saw the defendant with a gun? Clearly not, but why not? Such a procedure would be properly prevented by the rule limiting the prosecution to the offenses shown by the evidence presented at the preliminary hearing. (*People v. Pitts* (1990) 223 Cal.App.3d 606, 903 [273 Cal.Rptr. 757] [which dismissed 47 counts alleging sexual abuse of children because supporting evidence was not adduced at the preliminary hearing].) The point of divergence between the majority and the dissent is illustrated by the dissent's reference to *People v. Salvato* (1991) 234 Cal.App.3d 872, 880 [285 Cal.Rptr. 837], which discusses the election required when ". . . the evidence tends to show more distinct criminal acts than charged." Contrary to the implication of the dissent, *Salvato* does not say that the pertinent evidence need not have been shown at the preliminary hearing. *Salvato*

discusses the range of permitted charged offenses which can be considered at trial based on the evidence preliminarily disclosed; Salvato does not countenance new evidence presented at trial to support new charges.

Comparison of the evidence at the instant preliminary hearing with the evidence used at trial to convict this appellant shows two different sets of witnesses, two different fact situations and, of least importance, possibly two different weapons. It is undisputed that one confluence of evidence was shown at the preliminary hearing and another was presented at trial. The two sets of evidence cannot be simply merged because the appellant could have been convicted under either set of facts. Neither can the ". . . hard realities of this case" (dis. opn., *post*, at p. 195) permit later disclosure of evidence not described at the preliminary hearing to substitute for the requirement of fair notice of the particular evidence supporting the charged offense. A minor variance in the description of the revolver would be permissible (and this is precisely what the pretrial amendment in this case appeared to propose), but different witnesses describing a different offense in a different place and at a different time is quite another matter.

In an effort to suggest that the effect of the shift in the prosecutor's argument was inconsequential, the dissent considers it significant that the appellant's defense was he "flatly denied having *any* revolver in his possession *at any time* on January 8 in Bay Point." (Dis. opn., *post*, at p. 196.) This begs the question; and I am left to wonder what other defense to the charge my dissenting colleague thinks could have been presented. The appellant could hardly have been expected to say, "I had a pistol but it wasn't the one described by the witnesses." The only other defensive tactic available was to attack the credibility of the witnesses, either directly or by alibi testimony; and the appellant did attack the credibility of Daniels without apparent success. It is not hard to imagine that such an attack on the credibility of this tardily disclosed witness, if it had been fully informed by the required preliminary hearing, could have had a better chance of success. Fair notice of the facts and witnesses upon which the prosecution intends to rely to prove a particular offense is a principal reason for requiring the preliminary hearing. Exceptions to the rule requiring the facts supporting the charges to be adduced at the preliminary hearing have been limited and should not be expanded in the manner proposed in the dissenting opinion. The purposes of early review by a magistrate and notice of the evidence to support the charged offense, which are fundamental to the preliminary hearing, would be largely subverted if informal disclosure, or even actual notice, were permitted to substitute for the required formal hearing.

Finally, this record cannot support the conclusion that appellant suffered no prejudice by his counsel's waiver of the jurisdictional defect which is

described at length in the lead opinion. The dissent contends at some length that the acquittal on the brandishing count, which involved the witnesses to the offense actually described at the preliminary hearing, can be explained away. I conclude the far simpler explanation offered by the majority is correct: the jury did not believe the witnesses to the brandishing and convicted appellant on the uncharged count belatedly argued by the prosecutor. The idea that the jury could have acquitted appellant of the brandishing count (Pen. Code, § 417, subd. (a)(2)) and yet believed the other testimony of the victims of the brandishing, and the suggestion that the jury found the charges to be "petty" or believed that this appellant deserved leniency, are hard to accept. I am well aware, as are both of my colleagues, that this record describes appellant to be a frightening, rude, angry and potentially dangerous fellow. Accordingly, I regard as highly dubious the dissent's proposition that the jury had any impulse toward leniency or believed much, if any, of appellant's version of these events.

This conviction must be reversed because the constitutional guaranty of due process is more important than the fate of any single defendant, however reprehensible he might appear to be.

**HAERLE, J.**—I respectfully, but strongly, dissent. The fact that there are two different "incidents" of gun possession by a felon does not mean that a prosecutor must charge two separate offenses, or even that there are such. Further, there is absolutely no statutory or constitutional impediment to the result in the instant case, much less any prejudicial ineffective assistance of counsel. I will deal with these points in the order just noted.

### A.

Preliminarily, it should be stressed that, when Penal Code section 12001, subdivision (k), says that, notwithstanding the "any firearm" phraseology of section 12021, "each firearm . . . shall constitute a distinct and separate offense," it does not mean that, in cases of multiple possessions of firearms, the district attorney *must* charge each possession as a separate offense. This is so because, among other things, of (1) the legislative history of that provision, (2) the doctrine of separation of powers, and (3) established precedent that multiple but similar offenses may sometimes be charged in one or several counts.

Subdivision (k) of Penal Code section 12001 was adapted in 1994 and was a well-advertised legislative overruling of *People* v. *Kirk* (1989) 211 Cal.App.3d 58 [259 Cal.Rptr. 44], which had held that the use of the word "any" in a weapons possession statute such as Penal Code section 12021

necessarily means that possession of multiple weapons at the same time constitutes a single violation. (See Stats. 1994, First Ex. Sess. 1993-1994, ch. 32, § 5, quoted in Historical and Statutory Notes,.51C West's Ann. Pen. Code, § 12001 (1999 pocket supp.) p. 56.) The fact that the Legislature desired to overturn that result does not, however, mean that a prosecutor *must* now charge possession of multiple weapons as· separate and distinct offenses. This is so because of both common sense and the doctrine of separation of powers. As our Supreme Court explained quite recently, the latter mandates that the executive branch (i.e., the prosecutor) and not the judicial branch decides what offenses are to be charged. (See *People* v. *Birks* (1998) 19 Cal.4th 108, 134-136 [77 Cal.Rptr.2d 848, 960 P.2d 1073].) As applied to this situation, it means that the prosecution *could have but did not need to* charge the possession of the two guns as two separate offenses.

Indeed, our appellate courts have often permitted the prosecution to charge theoretically multiple offenses *either* separately or jointly. For example, in a case where multiple entries into the same dwelling were charged as a single burglary, our Supreme Court stated: "[W]e need not concern ourselves with whether multiple burglaries properly could have been alleged . . . ." (*People* v. *Montoya* (1994) 7 Cal.4th 1027, 1046, fn. 10 [31 Cal.Rptr.2d 128, 874 P.2d 903].) By way of contrast, in *People* v. *Washington* (1996) 50 Cal.App.4th 568, 574-579 [57 Cal.Rptr.2d 774], and *In re William S.* (1989) 208 Cal.App.3d 313, 317 [256 Cal.Rptr. 64], exactly the same conduct was permitted to be charged as multiple burglaries. Thus, just because something *may* be charged as a separate offense doesn't mean it *must* be; sometimes an offense may be charged *either* separately or jointly with a closely related offense. (See generally, the cases cited above; and 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, §§ 117, 122, pp. 137, 141.)

## B.

Second, the fact that there are two separate incidents of gun possession does not mean that there are two separate "offenses." Indeed, by far the troubling feature of the majority's opinion is its persistent confusion of the concepts of "offense" and "incident." This confusion is made manifest by a comparison of the constantly shifting terminology utilized by it in the "Discussion" portion of its opinion. Thus, when it is discussing either cases it believes support its analysis or the appellant's basic contention on appeal, the majority consistently uses phraseology such as " 'offense not shown by the evidence at the preliminary hearing.' " (Lead opn., *ante,* at p. 165; see also *id.* at pp. 166, 167, 171, 172-173, 175, 177.) But when it alludes to the relevant facts in the case at bench, it conspicuously reverts to the term

"incident." (See lead opn., *ante*, at pp. 167, 168, 169, 170, 171, 176, 178.) Indeed, sometimes the two words are used interchangeably in the same sentence (lead opn., *ante*, at p. 178) or adjacent paragraphs (lead opn., *ante*, at p. 171), with no apparent differentiation between the two. The majority is, I believe, attempting to equate the two terms, i.e., to suggest that where, as here, there are two distinct "incidents" of possession of a gun there are automatically two distinct "offenses."

In this case, *the offense is the same—possession of a gun by a felon; all that is different is the gun and the witnesses to its possession!* The majority completely fails to appreciate this critical point. The impact of this failure is most pronounced when it uses cases holding that an information cannot be amended to charge an offense not shown by the evidence at the preliminary examination to argue that an information cannot be amended *so as to deal in combination with two very similar incidents both constituting the same offense.*[1]

The majority correctly notes that the prosecution first charged possession of a .38-caliber revolver (the gun testified to by the neighbors at the preliminary hearing), then figured out during trial that maybe appellant possessed two different guns on the same day in the same neighborhood, then amended to delete the words ".38 caliber" from the information, and concluded by arguing to the jury that appellant possessed two guns on the day in question.[2] The majority suggests this process constitutes error because only one possession-by-a-felon offense was charged in the information.

---

[1]This entirely uncomplicated point seems to elude the majority. Repeatedly, it stresses that "Daniels's testimony described an offense entirely separate from and unrelated to the only offense described by the evidence at the preliminary hearing" (lead opn., *ante*, at p. 172), that the issue at hand is "a court's authority to convict of an offense not shown by the evidence at the preliminary hearing" (lead opn., *ante*, at p. 174) or, alternatively, whether the defendant had "notice of the offense being prosecuted" (*ibid.*), and that there is "obvious illegality [in] prosecuting and convicting appellant of an offense not shown by the evidence at the preliminary hearing . . . ." (Lead opn., *ante*, at p. 182.) I repeat: the offense was and is *always the same: possession of a gun by a felon.* Only the underlying evidence of that offense was different as between the two incidents.

[2]The two revolvers involved were indeed quite similar. As matters sorted themselves out at trial, the gun Daniels returned to appellant on the morning of January 8, 1996, was apparently a Ruger Security Six or Speed Six gun, i.e., a .357 magnum revolver, having a four- to six-and-a-half-inch barrel, the thumb catch shaved off the hammer, and a rectangular handle. The gun the neighbors apparently saw during the nighttime incident on the same day in the same neighborhood was described as a .38-caliber Smith & Wesson "snub nose" with a two- or two-and-a-half-inch barrel, a thumb catch, and a teardrop-shaped handle. Both the police and the prosecutor (the latter at least up until various witnesses started testifying) apparently thought that appellant was in possession of the same revolver in both the morning and evening incidents. Indeed, the prosecutor argued that the gun Daniels described "looks like a .38 caliber"; there was even testimony that a .357-caliber gun can fire ammunition designed for a .38-caliber gun and that the Ruger revolver came in varying barrel lengths, i.e., six-inch,

However, the woods are literally full of cases in which the prosecution proves more offenses than it has charged—exactly what happened here. Most but not all of these cases have involved child abuse prosecutions. The author of the lead opinion here, Presiding Justice Kline, accurately noted that an "either/or rule" applied in such cases. (See *People* v. *Moreno* (1989) 211 Cal.App.3d 776 [259 Cal.Rptr. 800] (*Moreno*).) There, he described that rule—approvingly, it would seem—as "the principle that 'when the accusatory pleading charges a single criminal act and the evidence shows more than one such unlawful act, *either* the prosecution must select the specific act relied upon to prove the charge *or* the jury must be instructed in the words of CALJIC No. 17.01 or 4.71.5 or their equivalent that it must unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act. (See *People* v. *Dunnahoo* [1984] 152 Cal.App.3d [561] at 568-570 [199 Cal.Rptr. 796], and cases cited therein including *People* v. *Deidrich* [1982] 31 Cal.3d [263] at pp. 280-281 [182 Cal.Rptr. 354, 643 P.2d 971].)' " (*Moreno, supra*, 211 Cal.App.3d at p. 786, quoting *People* v. *Gordon* (1985) 165 Cal.App.3d 839, 853 [212 Cal.Rptr. 174], fns. omitted (*Gordon*).)

This "either/or rule" was approved not only in the cases cited by Justice Kline in *Moreno* but also, one year later, by our Supreme Court in *People* v. *Jones* (1990) 51 Cal.3d 294, 307 [270 Cal.Rptr. 611, 792 P.2d 643] (*Jones*), a decision which not only cited *Moreno* approvingly (*id.* at pp. 310-311) but bestowed similar blessings on the cases *it* cited regarding that rule, *People* v. *Dunnahoo* (1984) 152 Cal.App.3d 561 [199 Cal.Rptr. 796] and *Gordon*, as well as others to the same effect. (51 Cal.3d at p. 307; see also *People* v. *Gear* (1993) 19 Cal.App.4th 86, 90 [23 Cal.Rptr.2d 261], and *People* v. *Salvato* (1991) 234 Cal.App.3d 872, 878-882 [285 Cal.Rptr. 837] (*Salvato*).)

The "either/or rule" was effectively followed here. One possession of a gun offense was charged but evidence was adduced as to two (again, both on the same day and in the same community). The jury was given CALJIC No. 17.01[3] and returned with a guilty verdict. So why doesn't the "rule" cited approvingly by Justice Kline nine years ago apply here? The majority does

---

four-inch "or shorter." In light of all this, the majority's suggestion that the prosecution was playing a deliberate "hide the ball" game regarding which incident it was relying upon (lead opn., *ante*, at pp. 176-177) seems to me a trifle churlish: I suspect there aren't very many prosecutors or police who could readily divine that the same felon would be exhibiting two separate and distinct revolvers in the same community on the same day.

[3]As and when the prosecution proves more offenses than it alleges, a unanimity instruction is required. If given, a guilty verdict on that count may stand. (See *Jones, supra*, 51 Cal.3d at pp. 321-322; *People* v. *Bradford* (1997) 15 Cal.4th 1229, 1343 [65 Cal.Rptr.2d 145, 939 P.2d 259].)

not tell us. Perhaps it does not because the cases applying it necessarily hold the opposite of its essential premise. It holds that, if the charged offense is the same and CALJIC No. 17.01 is given, the prosecution may prove multiple "incidents" to establish the same "offense."

The most recent decision of this district to so state is *Salvato, supra,* 234 Cal.App.3d 872, a decision authored by then Presiding Justice Low of Division Five of this district. That case dealt not with child molestation, but with various and sundry threats of injury or death sent by the husband in an acrimonious dissolution action to his former wife. On appeal from his conviction on six counts of violations of Penal Code sections 136.1, 422, 522 and 523, he contended that, because he specifically requested such prior to trial, he was entitled to a prosecutorial "election" as between the "specific acts" it would rely upon as to three of the counts on which he was convicted. The court agreed with this contention as to one count and disagreed as to the others. As a result, it reversed on one count and affirmed on the remainder. In the process, however, Justice Low and his colleagues both approved the "either/or" rule (234 Cal.App.3d at p. 880) and also carefully analyzed the essential difference between "acts" (i.e., "incidents" in the majority opinion) and "offenses." Thus, in discussing *People* v. *Castro* (1901) 133 Cal. 11 [65 P. 13] (*Castro*), the leading case on a defendant's right to such an "election," Justice Low wrote: "*Castro* establishes the following principles: (1) When the evidence tends to show a larger number of distinct criminal acts than have been charged, the prosecution must, upon defense request, select the specific act upon which it will rely for each allegation; (2) if there is no request for an election, the court must instruct the jury so as to ensure unanimity." (*Salvato, supra,* 234 Cal.App.3d at p. 879.) The court then held that no case subsequent to *Castro* "mandates departure from the . . . rule entitling [a] defendant to an election on demand when the evidence tends to show more distinct criminal acts than charged." (*Id.* at p. 880.) And, later in the opinion, it continued to differentiate between "distinct acts" and a charged offense. (See, e.g., *id.* at pp. 881-884.)

The point of these portions of *Salvato* (as well as the many similar cases cited above) is obvious: there is a fundamental difference between the "offense" which is charged in an information and the "acts" or "incidents" which may be used to prove it. Even where there is only one of the former, several of the latter may be used to prove it, subject, of course, to the multiple protections of (1) the "either/or" rule, (2) the requirement of a unanimity instruction, and (3) and election-on-demand (the subject of

*Salvato*). The lead opinion utterly fails to grasp this basic point and its importance to this case.[4]

## C.

The majority holds that the main error underlying the conviction is that the preliminary examination dealt only with the neighbors gun and appellant must have been convicted (for the reasons just noted) on the "distinct offense" (lead opn., *ante*, at p. 171) of the "Daniels gun." This, they hold, violates the "rule" that the preliminary examination must provide notice to a defendant of the offense of which he is going to be charged. The majority attempts to elevate this "error" to constitutional magnitude by suggesting that appellant's conviction thus violates the requirement of article I, section 14, of the California Constitution (lead opn., *ante*, at p. 170), or at least that provision as it was interpreted in *Jones* v. *Superior Court* (1971) 4 Cal.3d 660, 666 [94 Cal.Rptr. 289, 483 P.2d 1241], which held that one may not be prosecuted "in the absence of a prior determination of a magistrate . . . that such action is justified."

Let us for the moment indulge the majority's speculation and assume that, indeed, the jury did in fact convict only on the "Daniels gun" evidence.[5] The majority concludes that reversal is then mandated because no evidence pertaining to that incident was presented in the preliminary hearing. But, the majority to the contrary, the law is clear that what must be presented at the preliminary hearing is evidence of the offense charged (in this case, possession of a gun by a felon), *and not details of the particular incident upon which the offense is based.*

One reason for this is that, as our Supreme Court has recently pointed out, the latter is eminently discoverable by all sorts of other means.[6] In *Jones, supra,* 51 Cal.3d at pages 316-319, a decision inexplicably ignored by the majority, the court discussed how far due process does and doesn't go in requiring prior notice to a criminal defendant regarding the charges against him. *Jones* was yet another child molestation case. In it, the court considered what detail of notice is mandated by due process. In the course of that

---

[4]So does the concurring opinion. Contrary to its implication, I am not positing any sort of a "continuing violation" principle here. I am simply advocating continued adherence to the principle set forth in the cases cited in this section, to wit, that the prosecution may, subject to the three separate and distinct protections noted in the text, introduce evidence of multiple "incidents" in support of a single charged offense. I see nothing in either the lead or concurring opinion even purporting to explain why that principle is not fully applicable here.

[5]But see part D, *post.*

[6]And, as Division Five of this district noted in *Salvato,* "preliminary hearing testimony is frequently less specific than testimony at trial in showing particular events." (*Salvato, supra,* 234 Cal.App.3d at p. 881.)

consideration, it held that a "defendant has no right to notice of the specific time or place of an offense, so long as it occurred within the applicable limitation period." (*Id.* at p. 317; see also *People* v. *Gear, supra,* 19 Cal.App.4th at p. 95.) The court further explained that the information and the preliminary examination were but two devices of several now available to a defendant to learn of the details of the prosecution's case: additionally, "the defendant may learn further critical details of the People's case through demurrer to the complaint or pretrial discovery procedures." (*Jones, supra,* 51 Cal.3d at p. 317.)

A second reason for this conclusion derives from a decision cited approvingly in *Jones, supra,* 51 Cal.3d at page 317. In *People* v. *Luna* (1988) 204 Cal.App.3d 726 [250 Cal.Rptr. 878] (*Luna*), disapproved on other grounds in *Jones, supra,* 51 Cal.3d at page 322, the court stated: "So long as the evidence presented at the preliminary hearing supports the number of offenses charged against a defendant and covers the time frame or time frames charged in the information, a defendant has all the notice the Constitution requires. Should a defendant in such circumstances feel the lack of greater specificity hampers his ability to prepare a defense, he may demur; to the extent the success of the demurrer depends upon an offer of proof concerning his intended defense, making such offer in camera ensures the defendant would not be compelled to disclose prematurely his defense strategy to gain the constitutionally adequate notice of the charges against him to which he is entitled." (*Luna, supra,* 204 Cal.App.3d at p. 748.)

I submit that precisely this rule applies here. The information in this case, as amended, advised appellant that he was charged with being a felon in possession of a revolver. He also knew that the prosecution was addressing, and addressing only, such possession on January 8, 1996, in Bay Point, Contra Costa County. The only thing he didn't know, from the combination of the preliminary hearing testimony and the information, was whether the charge encompassed both revolvers and both sets of witnesses or, if not, which one. I think the law, as defined in *Jones* and *Luna,* is absolutely clear that no principle, constitutional or statutory, mandates such that he have such notice.[7]

There is also the matter of the cold, hard realities of this case. As the majority concedes (lead opn., *ante,* at p. 171), appellant had plenty of notice

---

[7]The concurring opinion professes not to object to the philosophy set forth in *Jones* and *Luna* (conc. opn., *ante,* at pp. 186-187), but it certainly does not follow it. The only reason it suggests for not doing so is that those cases were "factually problematic" child molestation cases. (Conc. opn., *ante,* at p. 186.) True, but nothing in them, or in any other authority of which I am aware, implies that a lower level of due process notice to the defendant is applicable in such cases versus, for example, gun possession cases.

that Daniels would testify as to the former's possession of a revolver on the morning of January 8. Approximately six weeks before trial, the prosecution informed defense counsel that Daniels had seen appellant with a Ruger Security Six revolver on or about that date. Moreover, the defense was given a copy of a taped interview of Daniels by an investigator from the district attorney's office, an interview which made clear than Daniels had witnessed appellant with a revolver on January 8. Thus, there is no doubt that appellant *in fact had notice* that the prosecution intended to rely on testimony regarding the "Daniels gun." Thus, for two separate and independent reasons, one based on controlling precedent and the other on the hard realities of this record, the majority's constitutional argument utterly fails.

### D.

My final basis for profoundly disagreeing with the majority's reversal of this conviction involves its ultimate basis of reversal, i.e., there was ineffective assistance of counsel. I disagree with its conclusion on this issue for two reasons. First of all, and for the several separate and distinct reasons set forth above, I disagree with the majority that there was any error manifested by the trial court to which trial counsel could have appropriately objected. (See, for a case coming to a similar conclusion in a similar situation, *People* v. *Newlun* (1991) 227 Cal.App.3d 1590, 1604-1605 [278 Cal.Rptr. 550].) Second, even if there was error which was incorrectly waived by trial counsel, I do not think there was any prejudice to appellant.

My conclusion that there was no prejudice rests, in turn, on three premises. First of all, it needs to be stressed that appellant's defense depended not one whit on any confusion between the guns much less any "lack of notice" problem. He admitted being where all witnesses placed him in both the morning and evening incidents, but flatly denied having *any* revolver in his possession *at any time* on January 8 in Bay Point. He did so both by his own testimony and by attacking the credibility of all the witnesses to both incidents, to and including charging two homosexual advances by Daniels. And, in his closing, appellant's counsel flatly argued that appellant possessed *no gun at all* on January 8. In sum, appellant's position in the trial court was unmistakable and uniform: the prosecution's witnesses were all liars and scoundrels, and he possessed neither gun on January 8.

Second, there was and is clearly substantial evidence that he possessed *both* guns on the day in question. Indeed, I do not understand the majority to even hint, much less contend, otherwise.

But there is yet a third reason why there is no prejudice here: the majority's conclusion that appellant must have been convicted based on the

"Daniels gun" incident because he was acquitted on the brandishing charge involving the "neighbors gun" does not withstand scrutiny. The majority states: "There is no apparent basis upon which a rational juror could have determined that Wallace and the Weighills were telling the truth as to appellant's possession of the firearm but not as to his pointing it at Wallace and the Weighills." (Lead opn., *ante*, at p. 182.) Among other things, this statement ignores (a) what constitutes "brandishing" under the Penal Code, (b) other more likely explanations for the "inconsistency," and (c) why verdicts sometimes appear inconsistent and what should *not* be concluded from such appearances.

Here, count 2 charged the misdemeanor of brandishing, which requires something more than simply "showing" a gun: it requires the drawing or exhibiting of the same "in a rude, angry or threatening manner . . . ." (Pen. Code, § 417, subd. (a)(2).) As contrasted with the majority's thesis, I submit it is far more likely that the jury acquitted appellant on the misdemeanor brandishing count because it concluded one or more of the following: (a) the quoted element was not shown, possibly due to Wallace's testimony that appellant didn't point the gun "at" him, (b) as far as any "brandishing" at Weighill was concerned, the latter was equally at fault for also having—and possibly also brandishing—a gun during the evening argument (not to mention his nonappearance at trial), (c) the prosecutor was being petty in tacking a misdemeanor count onto an easily proved (with either gun) felony count, or (d) some leniency was warranted in view of their conviction of him on the felony count and/or the behavior of Weighill and Wallace. I suggest that some combination of these alternatives is equally—if not more—likely as that contended for by the majority.

The appellate courts of this state have long stressed that little or nothing should be made of an apparent inconsistency in verdicts on different counts of an information. Justice Chin, then with Division Three of this district, summarized the law in this area in *People* v. *Pahl* (1991) 226 Cal.App.3d 1651, 1656-1657 [277 Cal.Rptr. 656]: "The question of the validity of inconsistent verdicts usually arises when a jury renders two verdicts on two different counts which are contradictory. [Citation.] Understandably, in such cases defendants, like appellant here, take the position that the acquittal is the legally correct verdict while the conviction is not. This argument has been universally rejected because inconsistent verdicts are probably the result of compromise in the jury room or of an extension of leniency or mercy to the defendant. [Citation.] In other words, if the conviction is supported by substantial evidence, it is valid because the defendant 'had the benefit of the jury's compassion, rather than suffering a burden because of its passion . . . .' [Citations.] [¶] Prior to 1927, appellate courts of this state

did not follow this view, but held that inconsistent verdicts 'would not support a judgment of conviction.' [Citations.] In apparent response to these decisions, the Legislature amended section 954 in 1927, adding the last sentence of the section, which now provides: 'An acquittal of one or more counts shall not be deemed an acquittal of any other count.' [Citations.] This amendment made clear that each count must stand on its own, and a verdict on one has no bearing on any other. Therefore, the fact that a guilty verdict on one count is inconsistent with an acquittal verdict on another no longer compels reversal if there is substantial evidence to support the conviction. [Citation.] Simply put, 'Consistency in the verdict is not necessary.' [Citation.] [¶] Since 1927 our courts have followed the general rule and viewed an inconsistent acquittal as the product of confusion or an act of mercy on the part of the jury, of which an appellant is not permitted to take further advantage. [Citations.] Thus California has codified and established ' "the unreviewable power of a jury to return a verdict of not guilty for impermissible reasons." [Citations.]' [Citation.]"

This same reasoning obtains when, e.g., a jury returns a verdict of guilty on multiple counts of assault with a deadly weapon but then, in dealing with the enhancement, finds he did not personally use a firearm in committing the offenses (see *People* v. *Lopez* (1982) 131 Cal.App.3d 565, 570-571 [182 Cal.Rptr. 563]) or when it renders inconsistent findings on "personal infliction of great bodily injury" enhancement allegations in companion counts of an information. (See *People* v. *Brown* (1985) 174 Cal.App.3d 762, 768-769 [220 Cal.Rptr. 264].)

In conclusion, I submit the majority has totally ignored the principle enunciated by us (via a panel including Presiding Justice Kline) in *People* v. *Pettaway* (1988) 206 Cal.App.3d 1312, 1325 [254 Cal.Rptr. 436], that " 'inconsistent findings may be caused simply by the mercy or leniency of the jury' [citation], to which we might add, or through confusion or ennui." (See to the same effect, *People* v. *York* (1992) 11 Cal.App.4th 1506, 1510 [15 Cal.Rptr.2d 66].)

### E.

The combination of the majority's confusion of "incident" and "offense" (see pt. B, *ante*) and its position as to what must be shown at a preliminary hearing (see pt. C, *ante*) necessarily means it is advancing the following proposition:

*Premise No. 1*: A single observed "incident" of possession of a gun by a felon is the equivalent of a single chargeable "offense";

*Premise No. 2*: At a preliminary hearing, the defendant must be presented with evidence of each offense charged;

*Therefore,* at a preliminary hearing, the defendant in a felon-in-possession-of-a-gun prosecution must be presented with evidence of each observed "incident" of possession for such to be admitted at trial.

Well, then, let us imagine a felon simultaneously in possession of not one but two similar-appearing guns. Over a 12-hour period (about the length of time between the "incidents" involved here), he periodically displays one or the other of these weapons to different witnesses in the same neighborhood. Assuming a single felon-in-possession charge in the information, if the majority is correct, for a conviction to stand the prosecution *must* present at the preliminary hearing testimony as to any "incident" concerning which it intends to introduce evidence at trial. I respectfully submit that this is both wrong and a radical departure from existing precedent.

I would affirm the conviction and deny the petition for a writ of habeas corpus.